1   Mark Mahon
2   Mariners Rest,
    Mariners View Avenue,
3   Passage West,
4   Cork,
    Ireland
5   Tel: + 353 87 742 4444
6   Email: movieman1000@live.com

7   *Pro Se*

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12  Mark Mahon, an individual,          Case No.

13              Plaintiff,              **COMPLAINT FOR:**

14      v.                             **1. Copyright Infringement;**

15  Mainsail LLC.; Shoreline Entertainment,   **2. Infringement of Right of the Author;**
    Inc.; Sam Eigen, an individual; Morris
16  Ruskin, an individual; and DOES 1 - 21,   **3. Trafficking in illicit labels or packaging;**

17              Defendants.            **4. Fraud;**

18                                     **5. Conversion;**

19                                     **DEMAND FOR JURY TRIAL**

20                                     **Exhibits 1 – 43** (p. 34 – p. 232.)

21

22

23

24

25

26

27

28

                        1
                    COMPLAINT

Plaintiff, Mark Mahon, alleges as follows:

## JURISDICTION

1.    This is a civil action seeking damages for copyright infringement under the Copyright Act of the United States, 17 U.S.C. § 101, *et seq.*, Fraud pursuant to 18 U.S.C. § 1343 and Conversion under State law.

2.    The Court has original subject matter jurisdiction over copyright claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.    This Court also has original subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 under diversity of citizenship and pursuant to 28 U.S.C. § 1350 for violation of the 'Berne Convention for the Protection of Literary and Artistic Works' in accordance with the "Berne Convention Implementation Act of 1988".

4.    This Court has further supplemental jurisdiction over Plaintiff's claims arising under State law pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

## VENUE

5.    This Court has personal jurisdiction over Defendants because, among other things, Defendants are doing business in the State of California and acts of infringement complained of herein occurred in the State of California.

6.    Venue in this district is also proper pursuant to 28 U.S.C § 1391(d) because in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State.

## THE PARTIES

7.    Plaintiff, Mark Mahon, ("Plaintiff") is an Irish Film and Television Academy award nominated writer, producer and director based in Cork, Ireland, whose work and books

2

COMPLAINT

1  have been featured and sold throughout the world.

2  8. Defendant Mainsail LLC. ("Defendant" or "Mainsail") is, on information and

3  belief, a Las Vegas Corporation organized and existing under the laws of the State of Nevada

4  with its principal place of business in the County of Los Angeles.

5  9. Defendant Shoreline Entertainment, Inc. ("Defendant" or "Shoreline

6  Entertainment") is, on information and belief, a California corporation with its principal place of

7  business in the County of Los Angeles, organized and incorporated under the laws of the State of

8  California.

9  10. Defendant Sam Eigen ("Defendant" or "Sam Eigen") is, on information and belief,

10  and thereon alleges that Defendant Sam Eigen is an individual residing in the County of Los

11  Angeles, State of California.

12  11. Defendant Sam Eigen, is on information and belief, and Plaintiff thereon alleges

13  that Defendant is the alter ego of Mainsail LLC. Plaintiff is informed and believes and thereon

14  alleges that Defendant individually participated in the management and control of said business

15  and is the owner of a interest of the shares of Mainsail and uses and continues to use Mainsail as

16  his shell and instrumentality through which he conducts his business, and in fact, the corporate

17  entity of Mainsail has no separate existence or identity. Plaintiff is further informed, believes and

18  thereon alleges that there is such a unity of interest in ownership between Mainsail, Shoreline

19  Entertainment and Defendant Sam Eigen, that there is in fact no separate existence between

20  Defendant Sam Eigen and Mainsail, and that Mainsail is the alter ego of Defendant Sam Eigen.

21  12. Defendant Sam Eigen, is on information and belief, the Chief Executive Officer of

22  Shoreline Entertainment Inc. Plaintiff is informed and believes and thereon alleges that Defendant

23  Sam Eigen, is the alter ego of Shoreline Entertainment. Plaintiff is informed and believes and

24  thereon alleges that Defendant is the joint owner and owns joint interest in the shares of Shoreline

25  Entertainment and uses and continues to use Shoreline Entertainment as his shell and

26  instrumentality through which he conducts his business, and in fact, the corporate entity of

27  Shoreline Entertainment has no separate existence or identity. Plaintiff is further informed,

28  believes and thereon alleges that there is such a unity of interest in ownership between Mainsail,

3

1    Shoreline Entertainment and Defendant Sam Eigen, that there is in fact no separate existence

2    between Defendant Eigen, Shoreline Entertainment and Mainsail, and that each corporation is the

3    alter ego of Defendant Sam Eigen.

4         13.    Plaintiff Mark Mahon believes and thereon alleges under information and belief

5    that at all times herein mentioned, Defendant Sam Eigen was the joint acting agent and joint

6    principal owner of Mainsail LLC and Shoreline Entertainment, Inc.

7         14.    Defendant Morris Ruskin ("Defendant" or "Morris Ruskin") is, on information and

8    belief, and thereon alleges that Defendant Morris Ruskin is an individual residing in the County

9    of Los Angeles, State of California.

10        15.    Defendant Morris Ruskin, is on information and belief, and Plaintiff thereon

11   alleges that Defendant is also the alter ego of Mainsail LLC. Plaintiff is informed and believes

12   and thereon alleges that Defendant individually participated in the management and control of

13   said business and is the owner of a interest of the shares of Mainsail and uses and continues to use

14   Mainsail as his shell and instrumentality through which he conducts his business, and in fact, the

15   corporate entity of Mainsail has no separate existence or identity. Plaintiff is further informed,

16   believes and thereon alleges that there is such a unity of interest in ownership between Mainsail,

17   Shoreline Entertainment and Defendant Morris Ruskin, that there is in fact no separate existence

18   between Defendant Morris Ruskin and Mainsail, and that Mainsail is also the alter ego of

19   Defendant Morris Ruskin.

20        16.    Defendant Morris Ruskin, is on information and belief, the Founder and Chairman

21   of Shoreline Entertainment Inc. Plaintiff is informed and believes and thereon alleges that

22   Defendant Morris Ruskin, is also the alter ego of Shoreline Entertainment. Plaintiff is informed

23   and believes and thereon alleges that Defendant is the joint owner and owns joint interest in the

24   shares of Shoreline Entertainment and uses and continues to use Shoreline Entertainment as his

25   shell and instrumentality through which he conducts his business, and in fact, the corporate entity

26   of Shoreline Entertainment has no separate existence or identity. Plaintiff is further informed,

27   believes and thereon alleges that there is such a unity of interest in ownership between Mainsail,

28   Shoreline Entertainment and Defendant Morris Ruskin, that there is in fact no separate existence

4

COMPLAINT

1    between Defendant Morris Ruskin, Shoreline Entertainment and Mainsail, and that each

2    corporation is an alter ego of Defendant.

3        17.    Plaintiff Mark Mahon believes and thereon alleges under information and belief

4    that at all times herein mentioned, Defendant Morris Ruskin was the joint acting agent and joint

5    principal owner of Mainsail LLC and Shoreline Entertainment, Inc.

6        18.    The true names and capacities of the defendants named herein as DOES 1 through

7    21, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore

8    sues said defendants by said fictitious names. Plaintiff is informed and believes, an thereon

9    alleges, that each of the defendants designated herein as DOE is legally responsible for the events

10   and happenings hereinafter alleged and legally caused injury and damages proximately thereby to

11   Plaintiff as alleged herein. Plaintiff will seek leave to amend the Complaint when the true names

12   and capacities of said DOE defendants have been ascertained. Mainsail LLC., Shoreline

13   Entertainment Inc., Sam Eigen, Morris Ruskin and DOES 1 through 21 are hereinafter

14   collectively referred to as "Defendants."

15       19.    Plaintiff is informed, believes and has proof, and on that basis avers, that each of

16   the Defendants participated in or benefitted from and is in some manner responsible for the acts

17   described in this Complaint and any damages resulting therefrom.

18       20.    Plaintiff is informed, believes and has proof, and on that basis avers, that each of

19   the Defendants and DOES 1 - 21 has acted in concert and participation with each other

20   concerning the claims in this Complaint.

21       21.    Plaintiff is informed and believes, and on that basis alleges, that each of the

22   Defendants and DOES 1 – 21 was empowered to act as the agent, servant and/or employees of

23   each other, and that all the acts alleged to have been done by each of them were authorized,

24   approved and/or ratified by each of them.

25

26                    **BACKGROUND AND FACTUAL ALLEGATIONS**

27       22.    At all times relevant hereto, Plaintiff has been and still is the holder of the

28   Exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et. seq.*, and all amendments

thereto) (the "Copyright Act") to reproduce, copy, publicly perform, distribute, sell, display, or license the reproduction, to make or reproduce derivative works, and/or display of his award-winning motion picture, trailer and award-winning cover listed as Exhibit ("*Exh.*") (*Exh.* 1, p. 35) attached hereto, which is the subject of this action (referred to herein as "STRENGTH AND HONOUR") throughout the world.

23.    Plaintiff is an entrepreneur who has used his experience, talent, and creativity developed over years of hard work to pursue his goal of making motion pictures. Plaintiff, Mark Mahon authored, wrote, produced, directed and financed his award-winning motion picture, 'STRENGTH AND HONOUR' (the "Motion Picture") starring Michael Madsen, Vinnie Jones and Richard Chamberlain, by depleting his life savings and personally borrowing money from his family and close friends. (*Exh.* 2, p. 37 - 38.)

24.    The Motion Picture follows the struggle of a single father who has to break his dying wife's last wish to never box again in order to save his young son's life; Plaintiff spent over two years travelling around the world on the international film festival circuit with his main actors to create a branding for the Motion Picture. (*Exh.* 3, p. 40 - 55.) It received two Irish Film and Television Academy award nominations, was nominated for over thirty (32) awards around the globe and won over twenty (20) awards in film festivals all over the world. (*Exh.* 1, p. 35.) Plaintiff's success created such strong word of mouth about the Motion Picture at the end of the film festival campaigning, Plaintiff was hosted to a Royal screening by His Serene Highness, Prince Albert, Sovereign Prince of Monaco at the Palace of Monaco (*Exh.* 4, p. 57 - 59), and Plaintiff, Mark Mahon and the Motion Picture's leading actor, Michael Madsen, were invited on the TODAY show in New York to talk about 'STRENGTH AND HONOUR' by Meredith Vieira. (*Exh.* 5, p. 61 - 62.)

25.    Plaintiff is the registered author and Copyright owner of the screenplay having registration no.TXul-289-556 at the United States Copyright Office (*Exh.* 6, p. 64) and the registered author, writer, producer, feature director and owner of the exclusive rights of the Motion Picture's Copyright having registration no. PA 1-398-376 at the U.S. Copyright Office. (*Exh.* 2, p. 37 - 38.)

26.     Plaintiff assigned his rights in trust to 'Maron Pictures Ltd., t/a Maron Pictures Limited Liability Company and Maron Pictures' ("Maron Pictures") under an 'Agreement to Acquire Literary Material' (*Exh.* 7, p. 66 - 80) and an 'Agreement to Acquire Authorship Rights' on September 25th, 2006. (*Exh.* 8, p. 82 - 92.) Plaintiff is also the sole, one hundred percent (100%) owner, beneficiary and one hundred percent (100%) shareholder of his company, Maron Pictures too. (*Exh.* 9, p. 94. ) Both agreements, in combination with each other, were to pay Plaintiff €300,000.00 (Three Hundred Thousand Euro) no later than the 30th day of September, 2015, in order for his grant of rights to become permanently assigned. In the event of non-payment, Plaintiff had the right to *revoke all rights* granted to Maron Pictures. (*Exh.* 10, p. 96 - 97.)

27.     Further, Plaintiff *never* "waive[d] his benefit of any provision of law known as the "droit moral" or moral rights or any similar law in any country of the world" (*Exh.* 8, p. 85) and the only award-winning display cover/poster that was ever authorized by Plaintiff contains the Motion Picture's leading actor, Michael Madsen, in the main body of the poster, displayed awards won from film festivals around the world, listed two Irish Film and Television Academy award nominations and two quotes branding the Motion Picture as the award-winning motion picture it is. (*Exh.* 1, p. 35.)

28.     In or around April 2009, Maron Pictures and Defendants entered into a "sole and exclusive" contract ("SAA") for fifteen (15) years in "all media" constructed by Defendants, with regard to the distribution of the award-winning Motion Picture. However, Maron Pictures *only* assigned "the sole and exclusive right, license and privilege to license to distribute" under a 'Grant of Rights' or the distribution right pursuant to 17 U.S.C. § 106(3) to Mainsail LLC ("Mainsail") for "the entire world, excluding North America and Ireland" in accordance with 17 U.S.C. § 201(d). Mainsail also does business under the banner of Shoreline Entertainment, Inc. However, Maron Pictures never transferred its rights pursuant to 17 U.S.C. §§ 106 (1), 106 (2), 106(4), 106(5), 106(6) and 106A(a) to any individual, corporate, associate or otherwise. Further, 17 U.S.C. § 201(d) TRANSFER OF OWNERSHIP states "(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or operation of law" and "(2) Any

1    of the exclusive rights comprised in a copyright, including any subdivision of any rights specified

2    by section 106, may be transferred as provided by clause (1) and owned separately. ***The owner of***

3    ***any particular exclusive right is entitled, to the extent of that right, to all of the protection and***

4    ***remedies accorded to the copyright owner by this title***." (emphasis added.) The contract specified

5    that "[Defendants] shall receive a ***flat fee of forty thousand dollars ($40,000)*** in sales expenses

6    and administration fees directly from the first Gross Proceeds" and "… ***fifteen percent (15%) of***

7    ***revenues generated*** … by [Defendants] on behalf of [Maron Pictures] in connection with the

8    Show." Maron Pictures were entitled to all remaining proceeds and revenues. Plaintiff at the

9    outset sent Mainsail the key art PSD file for the only authorized award-winning cover/poster to be

10    displayed publicly and 27 high resolution photographs as requested by them. (*Exh.* 11, p. 99 -

11    100.) Then, as part of their agreement, ***Maron Pictures sent all the master elements for the***

12    ***Motion Picture 'STRENGTH AND HONOUR' to Visual Data in Burbank, California*** (*Exh.*

13    12, p. 102 - 106) including the only authorized trailer to be displayed publicly, as an award-

14    winning motion picture. (*Exh.* 13, p. 108.)

15      29.    In or around January 2010, the Motion Picture was commercially released in

16    Ireland (*Exh.* 14, p. 110) and Europe with illicit covers and trailer, and not the cover or trailer

17    Plaintiff had provided to Mainsail in violation of his Copyright, 17 U.S.C. §§ 106(1), 106(2),

18    106(3), 106(5) , 106A(a) and 501. (*Exh.* 15, p. 112.) After learning of this Maron Pictures

19    engaged the services of an attorney from Los Angeles because Maron Pictures had provided

20    Defendants with an 'exclusive' product cover and trailer that displayed his motion picture as the

21    award-winning movie it is, as part of his 'deliverables.' (*Exh.* 2, p. 35 ; *Exh.* 13, p. 108.)

22      30.    On January 30th, 2010, after countless written requests, Maron Pictures then

23    formally instructed Respondents "to 'cease and desist' from distributing" his copyright protected

24    motion picture, which Maron Pictures warned "is doing untold damage to [his] product and

25    people's reputations." Maron Pictures also instructed Defendants to remove the product in "any

26    place where the product's images or trailers is listed for sale." (*Exh.* 16, p. 114.)

27      31.    On January 31st, 2010, Maron Pictures wrote to Defendants again and stated "you

28    are in breach of our contract and the contracts in place with [Plaintiff] and Michael Madsen.

1    Remove all product until the matter is resolved, as failure to do so will result in [Plaintiff] seeking

2    substantial damages and costs from [Defendants] and E1." (*Exh*. 17, p. 117.) Mainsail was also

3    provided the entire cast and crew contracts in relation to the Motion Picture as part of their

4    delivery. (*Exh*. 18, p. 119.)

5         32.    On February 9, 2010, Maron Pictures also contacted Entertainment One ("eOne")

6    directly, as its "cease and desist" instructions to Defendants were ignored and spoke to Poonam

7    Sahota, Acquisitions Manager. Maron Pictures explained that the marketing and artwork was a

8    clear violation of Plaintiff's contract, the Motion Picture's leading actor, Michael Madsen's

9    contract and asked eOne to "cease and desist" with their release in Ireland and scheduled release

10   in the United Kingdom for February 22, 2010. On February 12, 2010, Maron Pictures emailed

11   Entertainment One and again relayed that it was "not happy about proceeding with the current

12   marketing and artwork." It further reiterated that it is "a clear breach of Mr. Madsen's and

13   [Plaintiff's] contract". (*Exh*. 19, p. 121.) Later the same day, Poonam Sahota of Entertainment

14   One emailed Maron Pictures and stated that she "copied Sam [Eigen] who represents Mainsail,

15   LLC, [Defendants] contractual licensor." She further stated that "Sam [Eigen] has informed us

16   further that the actor agreement with Michael Madsen [leading actor] indicates that Michael

17   Madsen is to receive second position billing." Of course, this information that Defendants relayed

18   to Entertainment One was factually incorrect, as Michael Madsen is the leading actor of the

19   Motion Picture and was to receive first position billing. It also should be noted that not only did

20   Mr. Madsen not receive his contractual first billing, but he did not even appear on the cover. (*Exh*.

21   15, p. 112.)

22        33.    Defendants also advertised the Motion Picture with a photograph of Vinnie Jones

23   on the back cover not even from the Motion Picture and marketed it as a "Brit flick" in offensive

24   cultural misappropriation. This was extremely distasteful and upsetting to Plaintiff, who financed

25   it and is an *Irish* writer, producer, director telling a story about an *Irish-American* living in

26   *Ireland* that is set amongst the *Irish* travelling community. It was also completely shot in

27   *Ireland*. (*Exh*. 20, p. 125.) In response to Poonam Sahota, Maron Pictures pointed out there are

28   "lots of inaccuracies in [her] email on [Defendants] behalf, even [Defendants'] quote about

1    having all control over the manner that it shall be sold and marketed," which referred to how it
2    would be marketed and sold to industry buyers as 1. Defendants were never assigned Plaintiff's
3    moral rights by Maron Pictures under its 'Grant of Rights' which is very precise about the Rights
4    that were only assigned, and 2. Plaintiff as the Author of the Motion Picture did "not waive his
5    benefits of any provision of law known as the "droit moral" or moral rights or any similar law in
6    any country of the world" to begin with, so it was not possible for Maron Pictures to assign
7    Rights it never had control of, nor were ever assigned. (*Exh*. 8, p. 85.) Maron Pictures further
8    made it clear that Entertainment One were told a "bare face lie in relation to Mr. Madsen's
9    contact" by Defendants. (*Exh*. 21, p. 127.)

10    34.    On February 14, 2010, with no response forthcoming from Entertainment One to
11    Maron Picture's request to speak directly to them, Maron Pictures again asked Entertainment One
12    in a single line email, "[c]an we schedule a call for maybe sometime tomorrow?" Ms. Sahota of
13    Entertainment One replied later that day stating "I met with Sam [Eigen] at Shoreline today and I
14    think the best and simplistic approach for us all is for our communications to go through them."
15    (*Exh*. 22., p. 130.) Entertainment One ignored all of Plaintiff's emails after this.

16    35.    With Defendants notified of the initial breach and failure to cure the breach within
17    the contract's sixty-day time restraint, Maron Pictures was then forced through its former attorney
18    to file a demand for arbitration on October 6, 2010, approximately 9 months after learning of the
19    issues in dispute. (*Exh*. 23, p. 133 - 138.) This demand, titled "Notice of Arbitration [Amended],"
20    sought damages for breach of contract, fraud, breach of the implied covenant of good faith and
21    fair dealing, conspiracy, and negligence, and fell well within the contractually-shortened one-year
22    limitation period of the SAA. *Id.* This filed demand for arbitration satisfied the contractual
23    obligation of "bring[ing] any action, suit or proceeding" because it provided Defendants with
24    notice of their breach, aligned with the mandatory arbitration clause of the contract, and served
25    the broader mutual intent of the parties for speedy dispute resolution. Two additional demands
26    were subsequently filed for arbitration, the last of which was dated October 14, 2010.

27    36.    On October 22, 2010, ***Defendants asked*** Maron Pictures through counsel if it
28    would agree to "[a] formal but non-binding mediation?" and then stated "[Defendants] would like

1    to find a way to resolve this dispute in a way that both parties can feel satisfied and *[Defendants]*
2    *believe the best way to do that is to avoid all the hassle and expense of arbitration.*" (*Exh.* 24, p.
3    140 - 144.)

4        37.    On November 16, 2010, Defendants picked a mediator and emailed Maron
5    Picture's former counsel stating "[h]ere is the mediator we used before http://www.derin.com."
6    (*Exh.* 25, p. 146.)

7        38.    On December 6, 2010, Maron Picture's counsel further agreed to the mediator that
8    was recommended and engaged by Defendants.

9        39.    Throughout 2010, Maron Pictures also made various requests for information from
10   Visual Data in Burbank, California but its requests were refused due to Visual Data's contractual
11   arrangements with Defendants. However, Maron Pictures were provided a 'masters report' as a
12   professional courtesy of all the master elements for the Motion Picture and award-winning trailer
13   that Maron Pictures had supplied to Visual Data on October 15, 2010. (*Exh.* 13, p. 108; *Exh.* 26,
14   p. 148 - 151.)

15       40.    On "February 3, 2011, Benjamin Anderson of Ropers, Majeski, Kohn, Bentley
16   formally wrote to [Maron Picture's] former attorney on behalf of Defendants, and confirmed that
17   "mediation is a viable path" to resolve the matter. (*Exh.* 27, p. 153.) Despite asking Maron
18   Pictures not to proceed with the arbitration and to do mediation instead, which Maron Pictures
19   agreed to do, Defendants had their attorneys then write to Maron Pictures former attorney on
20   February 10, 2011 after committing to mediation stating that their client would be "unavailable to
21   participate in mediation until after May 27th," 2011." (*Exh.* 28, p. 155.) The arbitration that
22   Maron Pictures had initiated was then closed on mutual consent to save on costs ["[Defendants]
23   to avoid all the hassle and expense of arbitration." (*Exh.* 24, p. 141), as mediation had been
24   mutually agreed at Defendants request and Defendants' attorney's confirmation of mediation via
25   formal letter on February 3, 2011, but then making themselves unavailable until June '11 at the
26   earliest. During the months that followed after June 2011, Defendants' attorneys deceived Maron
27   Picture's attorney as he tried to schedule numerous dates via calls to the agreed upon mediation,
28   which Respondents had requested.

1     41.    On March 20, 2012, Maron Pictures wrote to Defendants directly, as no mediation

2  date was forthcoming and formally demanded an accounting. (*Exh*. 29., p. 157.) On April 1, 2012,

3  Defendants replied it "no longer [had] a business arrangement" with Maron Pictures and had

4  "nothing further to add." On *June 5, 2012*, Maron Pictures replied that it would now "address all

5  [its] issues directly through the litigation route." (*Exh*. 30, p. 159.) Meanwhile, back home in

6  Ireland, Plaintiff was forced to get the substantial legal fees due to the unforeseen deceptive

7  conduct of Defendants, and faced tremendous difficulties from his family and abuse from his

8  friends, who believed that he was making a fortune and just refusing to pay them back the money

9  he had borrowed from them, as his Motion Picture was screening on Sky Movies [Premium Pay

10  per film television channel owned by Sky, a division of Comcast] in Ireland/United Kingdom

11  almost weekly. Plaintiff also had to deal with the untimely death of his 24 year old sister during

12  this time too. However, on *March 22, 2013*, Maron Pictures did file its lawsuit, ten months later

13  and less than the one year contractual limitation requirement. The original complaint asserted

14  causes of action for declaratory relief, fraud, rescission, breach of contract, negligent

15  misrepresentation, breach of fiduciary duty and for an accounting. (*Exh*. 31, p. 164.)

16     42.    Over the coming years, Plaintiff subsequently found out that Defendants licensed

17  the Motion Picture for use and commercially released it in over 41 countries, namely 1. Bahrain

18  2. Egypt 3. Iran 4. Iraq 5. Jordan 6. Kuwait 7. Lebanon 8. Oman 9. Palestinian Territories 10.

19  Qatar 11. Saudi Arabia 12. Syria 13. United Arab Emirates 14. Republic of Yemen 15. Algeria

20  16. Morocco 17. Tunisia 18. Libya 19. Mauritania 20. Sudan 21. Somalia 22. Malta 23. Ireland

21  24. United Kingdom 25. Romania 26. Thailand 27. Vietnam 28. Australia 29. New Zealand 30.

22  Russia 31. Turkey 32. Indonesia 33. Malaysia 34. Brunei 35. Greece 36. Cyprus 37. Sweden 38.

23  Denmark 39. Norway 40. Finland and 41. Iceland. It turned millions of dollars globally and

24  enjoyed success all over the world. However, Plaintiff was not paid his consideration in

25  accordance with his 'Agreement to Acquire Literary Material' and his 'Agreement to Acquire

26  Authorship Rights' because Maron Pictures was never paid one brown cent or received a single

27  royalty report from Defendants. Accordingly, on the *1st day of October, 2015, Plaintiff sent a*

28  *formal 'Notice of Contract Revocation' to Maron Pictures revoking all rights* he had assigned

to it as per clauses 5 and 4 of his Agreement, respectively. (*Exh.* 7, p. 71 – 72 ; *Exh.* 8, p. 85 – 86 ; *Exh.* 10, p. 96 – 97.) Further, under the 'Assignment' clauses 14 and 11 of his Agreement, respectively, it states "Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any person, firm or corporation without limitation, and *this Agreement shall be binding upon* and inure to the benefit of *the parties hereto and their successors, representatives and assigns* forever." (emphasis added.) (*Exh.* 7, p. 77 ; *Exh.* 8, p. 90.)

43.     On February 10, 2016, Defendants' first "Motion for Summary Adjudication [wa]s GRANTED as to all claims against Maron Pictures except for [Defendants'] violation of para. 12.2's accounting obligation."

44.     On or around June 8, 2016, Maron Pictures then filed a first amended complaint against Defendants which asserted causes of action for declaratory relief, breach of contract, accounting, and conversion.

45.     At a court hearing pursued by Maron Pictures in State court during June 2016, the court found that Mainsail LLC "stopped all licensing activities when it received a "cease and desist" letter from Maron Pictures on January [30], 2010." (*Exh.* 16, p. 114.) Defendants (who had no rights relating to the Motion Picture other than those arising out of the agreement) also testified that Maron Pictures never delivered the Motion Picture to them, which Maron Pictures only heard for the first time during the trial, and which Maron Pictures still disputes as (1) it was just not possible for Defendants to get the masters or individual elements for 'STRENGTH AND HONOUR' from anywhere else in the world, and (2) any derivative that was unlawfully created could only be produced from the master elements that were provided by Maron Pictures. The court also noted, "it is undisputed that no accounting statements provided for by Paragraph 12.2 of the SAA were ever given to Maron Pictures, nor has Maron Pictures received any revenue from [M]ainsail as a result of the licensing revenue it did receive."

46.     On December 1, 2016, Plaintiff met with a copyright solicitor on a personal basis, Mark Stafford, partner of Lee & Thompson LLP in London, who had also been sent the 'Notice of Contract Revocation' that Plaintiff had sent Maron Pictures on October 1, 2015, and sought legal advice in relation to same. (*Exh.* 32, p. 166 – 168.)

47.    On December 9, 2016, the court then granted Judgment in favor of Mainsail LLC, Shoreline Entertainment, Inc., Sam Eigen and decreed that Maron Pictures would take nothing by way of its complaint. (*Exh*. 34, p. 179 – 180.) In other words, the court ruled that the contract was *not* enforceable and thus, Maron Pictures was not entitled to an accounting. However, since Maron Pictures never delivered the Motion Picture as claimed by Defendants, i.e. Plaintiff's personal property, Defendants had no legal right to use Plaintiff's property and had used it without Maron Pictures consent before October 1, 2015 and used it without Plaintiff's consent under the continuing violation doctrine.

48.    Meanwhile, Plaintiff's Motion Picture still continued to be performed around the world in 2016 contrary to Defendants' testimony and "a "cease and desist" letter from Maron Pictures on January [30], 2010", which was purportedly acted upon by Defendants in 2010. The Motion Picture was also still being exploited all over the world in violation of Plaintiff's copyright 17 U.S.C. §§ 106(1), 106(2), 106(3), 106(4), 106(5), 106(6), 501 and his moral rights contrary to 17 U.S.C §§ 106A(a), 501. (*Exh*. 33, p. 170 – 177.) Plaintiff also made a commercial purchase of it in 2016 for proof of the willful infringements. (*Exh*. 35, p. 182 – 184.)

49.    On or about February 16, 2017, a Notice of Appeal was lodged with the appellate court. The Opinion states "[i]n Maron Pictures's attempts to show error on appeal, Maron Pictures refers repeatedly to various provisions of Federal Copyright Law (17 U.S.C. §§ 106, 106A, 122, 501, 502, 506). Maron Pictures did not mention these provisions in its complaint, in opposition to summary judgment, or in its trial brief. Maron Pictures did proffer a certificate of copyright registration as an exhibit at the trial, but it was not admitted into evidence. Maron Pictures did not provide a reporter's transcript on appeal and there is nothing in the record which shows the purpose of that exhibit. Although Maron Pictures claims in its opening brief that its trial counsel "instructed the court" that Maron Pictures was entitled to the full protection of Federal Copyright Law, in the absence of a reporter's transcript there is nothing in the record to support this claim." (Op. at 5.)

50.    The Court of Appeal's Opinion also states "[a]lthough the parties designated the trial exhibits as part of the record on appeal, the clerk of the superior court was unable to include

14

1   those exhibits." (Op. at 26.) The trial Court not only lost the original exhibits that were supposed

2   to be part of the record, but refused to add the copies Maron Pictures retained, contrary to Rule of

3   Court 8.155(b), so Maron Pictures had to file a motion to augment.

4       51.     The appellate court then granted Defendants' motion to augment but denied Maron

5   Pictures request to augment the record, with the exception of "the original complaint in this

6   matter … and a copy of trial exhibit 329". (Op. at 27.) Of the 203 pages of evidence in Maron

7   Picture's motion to augment, Defendants judicially noticed 5 pages, trial exhibits 254, 327, 331,

8   333 and 338, which were admitted into evidence. "The remaining trial exhibits attached to the

9   Mahon declaration appear to have been marked and introduced at trial, but not admitted into

10  evidence." (Op. at 27.) However, every exhibit in Maron Picture's motion to augment was

11  introduced in evidence, marked for identification, used by the parties and treated as evidence.

12      52.     Furthermore, the appellate court also refused Maron Picture's request to augment

13  the record with a correct copy of the 'First Amended Complaint.' The correct 'First Amended

14  Complaint' which was originally filed on 06/08/16 had a 'Film Audit Report' dated September

15  17, 2020 (*Exh*. 36, p. 186 – 190) and a 'Film Proceeds Report' attached dated September 20, 2020

16  summarizing funds that were due to Maron Pictures. (*Exh*. 37, p. 192 – 195.) These reports were

17  compiled by a retained expert, James W. Huddleston, to audit the financial documents containing

18  the sales data only provided during formal discovery responses by Defendants to Maron Pictures.

19  "The Low-Case Film Proceeds calculation was determined by reviewing the distribution

20  statements, deal memos, and royalty accounting reports provided [during discovery] by the

21  Licensor and the [Defendants]." (*Exh*. 37, p. 194.) "When considered all the territories the Film

22  was been licensed to, including the United Kingdom, Australia, Russia, Netherlands, and

23  throughout the Middle East, and all the various platforms the Film has been released on, including

24  Theatrical, Home Video, Pay-Per-View, Video-On-Demand, Cable, Satellite, and Free

25  Television, the report finds that the Film has generated gross revenue of $2,852,000." (*Exh*. 36, p.

26  187.) "*The Low-Case calculation [of royalties earned by Defendants] totals $428,115.*" (*Exh*.

27  37, p. 194.) On February 15, 2019, the appellate court's Opinion was filed and affirmed the

28

1    appeal from a judgment of the Superior Court of Los Angeles County, H. Chester Horn, Jr.,
2    Judge.

3        53.    Maron Pictures also subsequently filed a petition for review to the Supreme Court
4    and a petition for writ of certiorari, which were ultimately denied but Maron Pictures still
5    endeavored to exhaust every route open to it. Meanwhile, during all of the above, Plaintiff's
6    copyright and his moral rights were still being infringed under the continuing violation doctrine
7    as is evidenced by commercial purchases in 2019. (*Exh.* 38, p. 197 – 215.)

8        54.    In or around early ***December 2019, Plaintiff only got evidence for the first time***
9    ***via an official confirmation from Visual Data that his copyright protected Motion Picture***
10   ***masters had been unlawfully copied in the State of California at Visual Data contrary to 17***
11   ***U.S.C. §§ 106 (1), 106 (2), 106 (5), 106A(a), 501 without his consent*** (*Exh.* 39, p. 217 – 218  ;
12   *Exh.* 40, p. 220) and those illicit copies were acquired by numerous companies around the world,
13   who have been commercially exploiting Plaintiff's copyright protected Motion Picture under the
14   continuing violation doctrine. (*Exh.* 41, p. 222 – 223.) However, since these illicit copies were
15   created in the State of California, then extraterritoriality copyright infringement applies to every
16   copy that stemmed from them, as the copyrighted Motion Picture masters were 'records' from
17   which the work could be 'reproduced', and it is a tort to make them in the United States. Previous
18   circuit court rulings have also found that the copyright holder may recover damages that stem out
19   of the country from a direct infringement of its exclusive rights that occurs within the United
20   States. (*Exh.* 2, p. 37 – 38.)

21       55.    In or around December 12, 2019, Plaintiff then wrote to Defendants and informed
22   them that they had infringed his Copyright and that he is entitled to recover his actual damages
23   and profits pursuant to Federal Copyright Law (17 U.S.C. § 504) and made a demand of
24   $9,220,235, which he required payment of. (*Exh.* 42, p. 225 – 230.) Plaintiff also attached a
25   certified copy of his Certificate of Registration from the United States Copyright Office, PA 1-
26   398-376, certified by Comyn, Kelleher, Tobin Solicitors and a letter from his Chartered
27   Accountants and Registered Auditors, Moore, confirming his actual costs/damages of $8,753,310.
28   (*Exh.* 43, p. 232.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CLAIM FOR RELIEF**

**Copyright Infringement – 17 U.S.C. § 106,** *et seq.*

**(Direct, Contributory Against All Defendants)**

56.    Plaintiff repeats and re-alleges the averments contained in paragraphs 1 - 55 as though fully set forth herein.

57.    Plaintiff, Mark Mahon, is the sole owner of the copyright in an original work that is fixed in a tangible media of expression. Effective on March 8, 2006, the United States Copyright Office issued a copyright registration certificate for the original screenplay, STRENGTH AND HONOR to Plaintiff. It was assigned number TXul-289-556 by the Copyright Office. Effective on August 6, 2009, the United States Copyright Office issued a copyright registration certificate for his Motion Picture, STRENGTH AND HONOUR, having registration number PA 1-642-297. Effective on May 3, 2017, the United States Copyright Office issued a supplementary copyright registration certificate for his motion picture, STRENGTH AND HONOUR, to reflect that Plaintiff, Mark Mahon, is the registered author, writer, producer, feature director and owner of exclusive rights of the Copyright having registration number PA 1-398-376 at the U.S. Copyright Office.

58.    Upon information, belief, proof and admission of use, Defendants have unlawfully produced, reproduced, distributed, sold for profit and publicly performed Plaintiff's copyright protected work and reproduced derivatives of Plaintiff's protected work that stemmed from the State of California in violation of his exclusive rights, including the individual images of the Motion Picture. Defendants' acts violate Plaintiff's exclusive rights under the Copyright Act, 17 U.S.C. §§ 106 and 501, including Plaintiff's exclusive rights to produce, reproduce, distribute copies of his work for their own profit, to make or reproduce  derivative works, sell the copyrighted work without Plaintiff's consent and to willfully display an illicit cover and trailer of his Motion Picture publicly.

59.    Defendants' infringement has been undertaken with intent to financially gain from Plaintiff's protected copyrighted work. Defendants have failed to exercise their right and ability to supervise persons within their control to prevent infringement, and they did so with intent to

1    further their own financial interests with the infringement of Plaintiff, Mark Mahon's rights as

2    author, writer, producer, feature director and owner of exclusive rights of his Motion Picture,

3    'STRENGTH AND HONOUR'. Accordingly, Defendants have directly and contributorily

4    infringed Plaintiff's copyrighted work.

5        60.    The above-described conduct by Defendants constitutes copyright infringement

6    under the Copyright Act. Further, 17 U.S.C. § 506 codifies that "[a]ny person who willfully

7    infringes a copyright shall be punished as provided under section 2319 of title 18, if the

8    infringement was committed- (A) for purposes of commercial advantage or private financial

9    gain;"

10       61.    As a result of the above-described conduct by Defendants, Plaintiff has been

11   damaged in an amount to be proven at trial and Plaintiff is entitled to his actual damages. Plaintiff

12   submits his actual damages are $8,753,310 for his copyright willfully infringed by Defendants.

13       62.    By reason of the copyright infringement described above, Plaintiff is also entitled

14   to recover Defendants' profits attributable in an amount to be proved at trial and to the extent the

15   same are not included as part of Plaintiff's damages. Plaintiff believes and has supporting

16   documents to show this to be at least in excess of $246,171. However, Plaintiff has also seen a

17   professional 'Film Audit Report' and 'Film Proceeds Report' completed in September 2015

18   concluding that Defendants earned a "Low-Case calculation total[ing] $428,115." Further, since

19   Plaintiff has never received any full or formal accounting, the exact figure cannot be determined

20   at this time but Plaintiff is entitled to recover all of Defendants' profits attributable to the

21   infringement under the continuing violation doctrine. Plaintiff also requests all other relief

22   allowed under the Copyright Act.

23       63.    Plaintiff is also entitled to recover from Defendants his costs and attorneys' fees

24   per copyright infringed for Defendants' copyright infringement.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

### Infringement of Right of the Author – 17 U.S.C. § 106A(a).

### (Direct, Contributory Against All Defendants)

64.     Plaintiff repeats and re-alleges the averments contained in paragraphs 1 - 63 as though fully set forth herein.

65.     Upon information, belief, proof and admission of use, Defendants have unlawfully produced, reproduced, distributed, sold for profit and publicly displayed Plaintiff's copyright protected work with unauthorized derivatives that stemmed from the State of California in violation of Plaintiff's moral rights. Defendants' acts violate Plaintiff's rights to attribution and integrity as author of the Motion Picture under the Copyright Act, 17 U.S.C. §§ 106A(a) and 501, which include Plaintiff's exclusive rights "to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation," and/or Plaintiff's exclusive rights that "prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right."

66.     Defendants' willful infringement of Plaintiff's right of the author has been undertaken with intent to financially gain from Plaintiff's protected copyrighted work. Defendants have failed to exercise their right and ability to supervise persons within their control to prevent this willful infringement, and they did so with malice and intent to further their own financial interests with the infringement of Plaintiff's moral rights as author of his award-winning Motion Picture, 'STRENGTH AND HONOUR'. Plaintiff never assigned his moral rights or right of the author to any individual, corporate, associate or otherwise in any country of the world. Accordingly, Defendants have directly and contributorily infringed the exclusive rights of the author, i.e., Plaintiff, Mark Mahon.

67.     The above-described conduct by Defendants constitutes willful copyright infringement under the Copyright Act. Further, 17 U.S.C. § 506 codifies that "[a]ny person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed- (A) for purposes of commercial advantage or private financial gain;"

19

68.     As a result of the above-described infringing conduct by Defendants, Plaintiff is entitled to his actual damages. Plaintiff has been damaged in an amount of $8,753,310 which are the copyright owner's actual damages for his copyright infringed by Defendants' willful copyright infringement.

69.     Plaintiff is also entitled to recover from Defendants his costs and attorneys' fees per copyright infringed for Defendants' copyright infringement.

70.     Defendants' infringement for the second claim for relief has caused irreparable harm to Plaintiff, Mark Mahon, for which he has no adequate remedy at law. Unless this Court restrains Defendants from infringing Plaintiff's protected work and moral rights, the harm will continue to occur in the future. Accordingly, Plaintiff is entitled to preliminary and permanent injunction.

## THIRD CLAIM FOR RELIEF

### Trafficking in illicit labels, or packaging – 18 U.S.C. § 2318.

### (Intentional Against All Defendants)

71.     Plaintiff repeats and re-alleges the averments contained in paragraphs 1 - 70 as though fully set forth herein.

72.     Upon information, belief, proof and admission of use, Defendants have unlawfully produced, reproduced, distributed, sold for profit and publicly displayed Plaintiff's copyright protected work with illicit labels/covers that stemmed from the State of California in violation of Plaintiff's copyright. Defendants' knowingly trafficked in illicit labels/covers /packaging as defined by 18 U.S.C. § 2318 (b)(4) and contrary to 18 U.S.C. § 2318 (b)(4)(B) which states "that is, without the authorization of the copyright owner – (i) distributed or intended for distribution not in connection with the copy, phonorecord, or work of visual art to which such labeling component was intended to be affixed by the respective copyright owner;" under the continuing violation doctrine. 18 U.S.C. § 2318 (c) also codifies for "a facility of interstate or foreign commerce is used or intended to be used in the commission of the offense;" and 18 U.S.C. § 2318 (c)(3) which states the "illicit label is affixed to, encloses, or accompanies, or is

1  designed to be affixed to, enclose, or accompany- (C) a copy of a copyrighted motion picture or

2  other audiovisual work;". Further, whilst 18 U.S.C. § 2318(a) codifies as "(1) Whoever, in any

3  circumstances described in subsection (c), knowingly traffics in - (A) a counterfeit label or illicit

4  label affixed to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany-

5  " shall be liable for criminal prosecution; 18 U.S.C. § 2318(e) also codifies for "Civil Remedies"

6  and states under 18 U.S.C. § 2318(e)(1) "Any copyright owner who is injured, or is threatened

7  with injury, by a violation of subsection (a) may bring a civil action in an appropriate United

8  States district court." It further allows for the court at its discretion under 18 U.S.C. §

9  2318(e)(2)(C) if any action is brought pursuant to paragraph (1) to award the injured party his

10  "actual damages and any additional profits of the violator."

11      73.    Defendants' willful acts in violation of Plaintiff's rights was undertaken with

12  malice and intent to financially gain from Plaintiff's copyright protected work. Defendants have

13  failed to exercise their right and ability to supervise persons within their control to prevent

14  trafficking in counterfeit and illicit labels or packaging, and they did so with intent to further their

15  own financial interests with violation of laws of the United States and of Plaintiff's copyright.

16  Plaintiff never assigned his moral rights or right of the author to any individual, corporate,

17  associate or otherwise in any country of the world. Accordingly, Defendants have directly and

18  willfully trafficked in illicit labels or packaging in violation of Plaintiff's contract and copyright

19  owner's rights without his authorization.

20      74.    The above-described conduct by Defendants constitutes trafficking in counterfeit

21  and illicit labels, or packaging.

22      75.    As a result of the above-described conduct by Defendants, Plaintiff has been

23  damaged in an amount of $8,753,310 which are the copyright owner's actual damages per

24  Defendants trafficking in illicit labels, or packaging.

25      76.    By reason of the trafficking described above, Plaintiff is also entitled to recover

26  Defendants' profits attributable in an amount to be proved at trial and to the extent the same are

27  not included as part of Plaintiff's damages. Plaintiff believes and has supporting documents to

28  show this to be at least in excess of $246,171. However, Plaintiff has also seen a professional

1  'Film Audit Report' and 'Film Proceeds Report' completed in September 2015 concluding that

2  Defendants earned a "Low-Case calculation total[ing] $428,115." Further, since Plaintiff has

3  never had a full or formal accounting, the exact figure cannot be determined at this time but

4  Plaintiff is entitled to recover all of Defendants' profits attributable whilst trafficking in illicit

5  labels, or packaging under the continuing violation doctrine.

6      77.    Plaintiff is also entitled to recover from Defendants his costs and attorneys' fees

7  per Defendants trafficking in illicit labels, or packaging.

8      78.    Defendants' trafficking in illicit labels, or packaging for the third claim for relief

9  has caused irreparable harm to Plaintiff, Mark Mahon, for which he has no adequate remedy at

10  law. Unless this Court restrains Defendants from infringing Plaintiff's protected work and moral

11  rights, the harm will continue to occur in the future. Accordingly, Plaintiff is entitled to

12  preliminary and permanent injunction.

13

14  **FOURTH CLAIM FOR RELIEF**

15  **Fraud – 18 U.S.C. § 1343.**

16  **(Oppression, Intentional Fraud, Malice and**

17  **Conscious Indifference Against All Defendants)**

18      79.    Plaintiff repeats and re-alleges the averments contained in paragraphs 1 - 78 as

19  though fully set forth herein.

20      80.    At a court hearing pursued by Maron Pictures in State court during June 2016, the

21  court found that Mainsail LLC "stopped all licensing activities when it received a "cease and

22  desist" letter from Maron Pictures on January [30], 2010." However, the same Motion Picture

23  was being used under the continuing violation doctrine since January 30, 2010.

24      (1) the fact that Plaintiff was still able to purchase his Motion Picture in 2016 and

25  2019 contrary to exactly what the text states in the ""cease and desist" letter from Maron Pictures

26  on January [30], 2010" clearly supports that Defendants misrepresented the true facts during their

27  testimony in June 2016.

28      (2) the fact that Defendants made a further sale of his Motion Picture on February

1    14, 2010 for $15,000, which falls after January 30, 2010 also clearly supports that Defendants

2    further misrepresented the true facts.

3         (3) the fact that Defendants sent out numerous illicit copies of his Motion Picture

4    masters from Visual Data to  (i) P.T. Parkit in Indonesia on February 8, 2010;

5                          (ii) Motion Link in Australia on March 15, 2010;

6                          (iii) MIS Label in Denmark on June 23, 2010;

7                          (iv) IPA in Burbank on July 20, 2010;

8                          (v) Village Roadshow Distributors in Greece on October 8, 2010;

9                          (vi) Falcon Films in Dubai on August 2, 2011

10   and indeed, sent the Masters to their own company, Shoreline Entertainment on May 31, 2017,

11   clearly shows that they did *not* stop "all licensing activities when it received a "cease and desist"

12   letter from Maron Pictures on January [30], 2010." The Visual Data evidence, which Plaintiff

13   only received for the first time on December 12, 2019 clearly supports that Defendants

14   misrepresented the true facts and their misrepresentations had adverse consequences for Maron

15   Pictures, which were adverse for Plaintiff, as Maron Pictures sole owner and sole beneficiary.

16       81.    These oral representations made by defendant Eigen on behalf of the Defendants,

17   constituted a knowingly false representation of material facts, with the intent to mislead in order

18   to avoid their own legal and moral obligations.

19       82.    The true facts are that Defendants were acting in concert with each other as they

20   intended to pocket all proceeds and refuse to pay Plaintiff or provide him proper accounting, all

21   of which was designed to conceal the correct facts, in violation of their contractual duty to Maron

22   Pictures, which had adverse for Plaintiff, as the sole owner and beneficiary of same.

23       83.    Plaintiff, Mark Mahon, alleges and the evidence supports that Defendants

24   knowingly made false representations, so that the true facts would never be known.

25       84.    Defendants had legal obligations to be honest and truthful in their dealings, and to

26   make the fullest disclosure of all material facts which had adverse affects for Plaintiff and stole

27   ten years of his life amongst everything else.

28       85.    The above-described conduct by Defendants constitutes intentional fraud,

1    oppression, malice, conscious indifference and reckless disregard of Plaintiff's rights.

2        86.    Plaintiff, Mark Mahon has been damaged by the actions of Defendants, and each

3    of them, are liable individually and collectively.

4        87.    Plaintiff respectfully submits that Defendants actions also constitute perjury

5    generally as defined by 18 U.S.C. § 1621. Further, Plaintiff submits that collectively Defendants

6    were aware of their actions and conspired against Plaintiff contrary to 18 U.S.C. § 1349 in order

7    to deprive Plaintiff of what is rightfully his and legally owing to him.

8        88.    Defendants authorized and ratified the wrongful conduct, and acted with

9    oppression, intentional fraud, malice, reckless disregard of the plaintiff's rights for over ten years

10    and conscious indifference of the consequences to act as alleged herein and intended to cause

11    injury to Plaintiff and did in fact cause injury to Plaintiff and this conduct, as alleged herein,

12    constituted a conscious disregard of Plaintiff's rights and justifies an award of punitive and

13    exemplary damages of at least $20,000,000 so that it would effectively deter similar conduct in

14    the future.

15

16                                **FIFTH CLAIM FOR RELIEF**

17                          **Conversion – California Civil Code § 3336**

18                            **(Intentional Against All Defendants)**

19        89.    Plaintiff repeats and re-alleges the averments contained in paragraphs 1 - 88 as

20    though fully set forth herein.

21        90.    At a court hearing pursued by Maron Pictures in State court during June 2016, the

22    court found that Mainsail LLC "stopped all licensing activities when it received a "cease and

23    desist" letter from Maron Pictures on January [30], 2010." However,

24            (1) the fact that Plaintiff was still able to purchase his Motion Picture in 2016 and

25    2019 contrary to exactly what the text states in the ""cease and desist" letter from Maron Pictures

26    on January [30], 2010" clearly supports that Defendants misrepresented the true facts.

27            (2) Defendants (who had no rights relating to the Motion Picture other than those

28    arising out of the agreement from Maron Pictures) testified that Maron Pictures never delivered

                                        24

1    the Motion Picture to them, which Maron Pictures only heard for the first time during the trial in

2    June, 2016. However, since Maron Pictures never delivered the Motion Picture as claimed by

3    them, i.e. Plaintiff's property, Defendants had no legal right to use Plaintiff's property and used it

4    without his consent under the continuing violation doctrine.

5        91.    Defendants improperly copied, distributed, performed Plaintiff's copyrighted

6    work, collected revenue from it and caused detrimental damage by the wrongful conversion of

7    Plaintiff's award-winning cover of his personal property, despite Plaintiff's clear ownership, and

8    right of possession to his property at the time of the conversion. Plaintiff did not consent to

9    Defendants tortuous conduct herein.

10       92.    In conversion, there always must be an element of voluntarily dealing with other's

11   property, inconsistently with their rights. Pursuant to 17 U.S.C. 201(d)(1) "ownership of

12   copyright may be transferred in whole or in part by any means of conveyance or by operation of

13   law, and may be bequeathed by will or pass as personal property". Therefore, copyright is legally

14   classified as personal property. Accordingly, the above-described conduct by Defendants

15   constitutes conversion of Plaintiff's personal property.

16       93.    Pursuant to California Civil Code 3336, the detriment caused by the wrongful

17   conversion of personal property is presumed to be: "First – The value of the property at the time

18   of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party

19   injured for the loss which is the natural, reasonable and proximate result of the wrongful act

20   complained of and which a proper degree of prudence on his part would not have averted;" and

21   "Second – A fair compensation for the time and money properly expended in pursuit of the

22   property."

23       94.    Defendants authorized and ratified the wrongful conduct, and acted with

24   oppression even after being directly advised of the facts by Plaintiff, gross negligence, fraud,

25   malice, reckless disregard of the plaintiff's rights for over ten years and conscious indifference of

26   his cultural heritage and of the consequences to act as alleged herein, which intended to cause

27   injury to Plaintiff and did in fact cause injury to Plaintiff and this conduct, as alleged herein,

28   constituted a conscious disregard of Plaintiff's rights and justifies an award of punitive and

1   exemplary damages pursuant to California Civil Code § 3294 of at least $20,000,000 so that it

2   would effectively deter similar conduct in the future.

3

4

5                                    **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiff prays for relief as follows:

7        95.    For an Order that Defendants be required to pay over Plaintiff the actual damages

8   suffered by Plaintiff as a result of the infringement of Plaintiff's copyright, exclusive rights and/or

9   moral rights under infringement of the right of the author and any profits of the Defendants

10  attributable to the infringement of Plaintiff's copyright or exclusive rights under copyright, and to

11  pay such damages to Plaintiff as to this Court shall appear just and proper within the provisions of

12  the Copyright Act, as set forth in 17 U.S.C. § 504;

13       96.    For an Order that Defendants trafficked in illicit labels, or packaging without

14  authorization of the copyright owner and distributed same illicit labels and packaging not

15  connected with the copies, or work of visual art to which such labeling component was intended

16  to be affixed by the Copyright owner and be required to pay over Plaintiff the actual damages

17  suffered by Plaintiff as a result of the illicit labels, or packaging; and profits of the violator that

18  are not taken into account in computing the actual damages, and to pay such damages to Plaintiff

19  as to this Court shall appear just and proper within the provisions of Trafficking in counterfeit

20  labels, illicit labels, or counterfeit documentation or packaging code, as set forth in 18 U.S.C. §

21  2318;

22       97.    For punitive and exemplary damages wherever alleged herein in a sum of not less

23  than $20,000,000;

24       98.    For an award of costs under 17 U.S.C. § 505 or as otherwise provided by law;

25       99.    For an award of attorneys' fees pursuant to 17 U.S.C. § 505 and 18 U.S.C. § 2318

26  (e) as Plaintiff will engage the services of counsel once the matter proceeds to trial.

27       100.   For an award of pre-judgment interest and post-judgment interest in the maximum

28  amount permitted by law;

1    101.    For such other and further relief as the Court deems just and proper.

2

3    Dated: February 21, 2020                          Respectfully submitted,

4

5                                                      By: _____

6                                                      Mark Mahon

                                                       Mariners Rest,
7
                                                       Mariners View Avenue,
8                                                      Passage West,
                                                       Cork,
9                                                      Ireland
10                                                     Tel: + 353 87 742 4444
                                                       Email: movieman1000@live.com
11

12                                                     *Pro Se*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

COMPLAINT

1

## **REQUEST FOR JURY TRIAL**

2       Plaintiff Mark Mahon hereby demands a trial by jury pursuant to Federal Rule of Civil

3   Procedure 38 on all issues so triable.

4

5   Dated: February 21, 2020                          Respectfully submitted,

6

7                                                     By: _____

8                                                         Mark Mahon
                                                          Mariners Rest,
9                                                         Mariners View Avenue,
                                                          Passage West,
10                                                        Cork,
11                                                        Ireland
                                                          Tel: + 353 87 742 4444
12                                                        Email: movieman1000@live.com

13

14                                                        *Pro Se*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBITS ATTACHED TO CIVIL COMPLAINT

### DOCUMENT TITLE AND DESCRIPTION

**PAGE**

Exh 1.    Only authorized, copyright protected 'STRENGTH AND                35
HONOUR' Cover/Poster.

Exh 2.    United States Copyright Certificate of Registration for            37 - 38
the Motion Picture, no. PA 1-398-376, a certified copy
by Comyn, Kelleher, Tobin Solicitors.

Exh 3    Photographs of Plaintiff, Mark Mahon, during his two                40 - 55
year film festival promotional campaign.

Exh 4    Palace of Monaco Invitation and Photographs of Plaintiff,           57 - 59
Mark Mahon and His Serene Highness, Prince Albert,
Sovereign Prince of Monaco at the Royal screening of
'STRENGTH AND HONOUR' at the Palace of Monaco.

Exh 5    Photograph of Plaintiff, Mark Mahon and the Motion                  61 - 62
Picture's leading actor, Michael Madsen on the Today Show
in New York with Meredith Vieira.

Exh 6    United States Copyright Certificate of Registration for             64
the Screenplay, no. TXul-289-556, a certified copy by
Comyn, Kelleher, Tobin Solicitors.

Exh 7    Plaintiff's 'Agreement to Acquire Literary Material,'               66 - 80
a true copy of the original certified by Comyn, Kelleher,
Tobin Solicitors.

Exh 8    Plaintiff's 'Agreement to Acquire Authorship Rights,'               82 - 92
a true copy of the original certified by Comyn, Kelleher,
Tobin Solicitors.

Exh 9    A letter from Moore Stephens, Chartered Accountants and             94
Registered Auditors confirming that Plaintiff, Mark Mahon is
100% owner and shareholder of Maron Pictures Ltd., t/a Maron
Pictures LLC and Maron Pictures, dated April 7, 2017.

Exh 10    Plaintiff's 'Notice of Contract Revocation' dated October          96 - 97
1, 2015, a true copy of the original certified by Comyn,
Kelleher, Tobin Solicitors.

**PAGE**

Exh 11          Email delivering key art PSD file for cover, poster          99 - 100
                dated April 18, 2009.

Exh 12          Email acknowledging receipt of Master elements from          102 - 106
                Visual Data in Burbank, California, dated August 25, 2009.

Exh 13          Masters Report of the master elements that were provided          108
                to Visual Data in Burbank, California for the only authorized
                trailer showing awards won, dated October 15, 2010, a true copy
                of the original certified by Comyn, Kelleher, Tobin Solicitors.

Exh 14          Illicit Cover used in Ireland in or around January, 2010 in          110
                violation of Plaintiff's contract, copyright and moral rights.

Exh 15          Illicit Cover used by Defendants in violation of the          112
                Motion Picture's leading actor, Michael Madsen's
                contract, Plaintiff's contract, Plaintiff's copyright
                and Moral Rights.

Exh 16          "Cease and desist" email sent to Mainsail LLC, dated          114
                January 30, 2010.

Exh 17          Final Warning email to Mainsail LLC dated          117
                January 31, 2010.

Exh 18          All Maron Picture's agreements including plaintiff's, cast,          119
                and crew contracts in relation to the Motion Picture were
                sent to Mainsail/Shoreline Entertainment via a YouSendIt
                download link, dated September 15, 2009.

Exh 19          Email from Maron Pictures to Entertainment One stating that          121
                it was "not happy about proceeding with the current marketing
                and artwork" and is "a clear breach of Mr. Madsen's and
                [Plaintiff's] contract, dated February 12, 2010.

Exh 20          Back of Illicit Cover used by Defendants in violation of the          125
                Motion Picture's leading actor, Michael Madsen's contract,
                Plaintiff's contract, Plaintiff's copyright and Moral Rights,
                and describing the Irish Motion Picture as a "Brit flick".

PAGE

Exh 21        Email from Maron Pictures to Entertainment One pointing out          127
              the inaccuracies in their email on Mainsail's behalf and Maron
              Pictures seeking an opportunity to speak directly and to come
              to a meeting of minds, dated February 12, 2010.

Exh 22        Email from Maron Pictures to Entertainment One seeking to            130
              schedule a call and and then, the response from Entertainment
              One to Maron Pictures saying "the best and simplistic approach
              for us all is for communications to go through [Mainsail]"[.],
              dated February 14, 2010.

Exh 23        "Notice of Arbitration [Amended]" filed on October 6,          133 - 138
              2010.

Exh 24        An email from Defendants stating asking to do a non-          140 - 144
              binding mediation, dated October 22, 2010.

Exh 25        An email with Defendants suggesting and selecting a                146
              mediator they used before, dated November 16, 2010.

Exh 26        Masters Report of the master elements of the Motion          148 - 151
              Picture that Maron Pictures provided to Visual Data in
              Burbank, California for the Motion Picture and award-
              winning trailer dated, October 15, 2010, a true copy certified
              of the original by Comyn, Kelleher, Tobin Solicitors.

Exh 27        Benjamin Anderson of Ropers, Majeski, Kohn, Bentley               153
              letter, dated February 3, 2011.

Exh 28        Defendants had their attorneys write on February 10, 2011          155
              after committing to mediation stating that their client would be
              "unavailable to participate in mediation until after May 27th".

Exh 29        Formal letter issued to Defendants by Maron Pictures, dated          157
              March 20, 2012.

Exh 30        Maron Pictures emailed Defendants and stated it would now          159
              "address all [its] issues directly through the litigation route"
              dated June 5, 2012.

**PAGE**

Exh 31      Cover page of Maron Picture's Complaint filed in State      164
Court dated March 22, 2013.

Exh 32      Email sent to Mark Stafford, copyright solicitor and partner      166 - 168
at Lee & Thompson LLP in London, showing that he was sent
the 'Notice of Contract Revocation' Letter in 2016 and before
our meeting at his office to discuss same on December 1, 2016.

Exh 33      A letter from Comyn, Kelleher, Tobin Solicitors in Ireland      170 - 177
confirming different companies still selling the Motion
Picture with the illicit cover dated, December 5, 2016.

Exh 34      Judgment received by Mainsail LLC, Shoreline      179 - 180
Entertainment Inc. and Sam Eigen, dated
December 9, 2016.

Exh 35      Proof of a commercial purchase from YouTube of      182 - 184
Plaintiff's Motion Picture in 2016, in violation of
Plaintiff's copyright and Moral Rights.

Exh 36      'Film Audit Report' compiled by a retained expert,      186 - 184
James W. Huddleston, dated September 17, 2020.

Exh 37      'Film Proceeds Report' compiled by a retained expert,      192 - 195
James W. Huddleston, dated September 20, 2020.

Exh 38      Proof that Apple Inc., Google Play, You Tube amongst      197 - 215
others were still selling Plaintiff's Motion Picture in 2019,
in violation of his copyright and Moral Rights.

Exh 39      Confirmation email from Visual Data that they copied the      217 - 218
Master elements provided to them, dated December 12, 2019.

Exh 40      Confirmation email from Visual Data in Burbank, California      220
attaching a report and acknowledging the deliverables created
from the source masters dated December 16, 2019.

Exh 41      Report from Visual Data in Burbank, California confirming      222 - 223
the deliverables they created from the source masters that
Maron Pictures had provided them and, the dates and names of
the companies they provided those illicit masters with, a true copy
of the original certified by Comyn, Kelleher, Tobin Solicitors.

**PAGE**

Exh 42          Financial Demand issued to Mainsail, LLC., Shoreline          225 - 230
                Entertainment, Inc., Sam Eigen and Morris Ruskin, dated
                December 12, 2019.

Exh 43          A letter from Moore, Chartered Accountants and Registered          232
                Auditors for Plaintiff, Mark Mahon confirming his actual
                costs/ expenditure, dated December 12, 2019.

# EXHIBIT 1



# EXHIBIT 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kayla Feyla Clayett*

Acting United States Register of Copyrights and Director



Form CA
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA 1-398-376

TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE
EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

05 / 03 / 2017
Month   Day   Year

§705. It will ap the information. ~~~~~~~~~ may be refused or delayed, and you may not be entitled to certain relief, remedies, and benefits under the copyright law.

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## A

**Title of Work ▼**

STRENGTH AND HONOUR

| Registration Number of the Basic Registration ▼ | Year of Basic Registration ▼ |
|---|---|
| PA 1-642-297 | August 6, 2009 |

| Name(s) of Author(s) ▼ | Name(s) of Copyright Claimant(s) ▼ |
|---|---|
| Maron Pictures | Maron Pictures |

## B

**Location and Nature of Incorrect Information in Basic Registration ▼**

Line Number __4__        Line Heading or Description __Author__

**Incorrect Information as It Appears in Basic Registration ▼**

Maron Pictures

**Corrected Information ▼**

Mark Mahon

**Explanation of Correction ▼**
MARK MAHON, IRISH CITIZEN, MADE A FILING ERROR AND PLACED HIS COMPANY NAME IN EVERY PLACE WHERE HIS NAME SHOULD HAVE BEEN PLACED IN ERROR. MARK MAHON IS THE WRITER, PRODUCER, DIRECTOR AND COPYRIGHT OWNER OF STRENGTH AND HONDUR.

## C

**Location and Nature of Information in Basic Registration to be Amplified ▼**

Line Number _____        Line Heading or Description _____

**Amplified Information and Explanation of Information ▼**

We certify that the within document is a true copy of the original.

Dated this **6** day of **February** 20

Signed: *Conyn Kelleher Tobin*

Cornyn Kelleher Tobin
Solicitors, 2 George's Quay, Cork

**MORE ON BACK ▶**    • Complete all applicable spaces (D–G) on the reverse side of this page.    • See detailed instructions    • Sign the form at Space F.

DO NOT WRITE HERE
Page 1 of _____ pages

[37]

We certify that the within document
is a true copy of the original.

Dated this 6 day of February 2020

Signed: Comyn Kelleher Tobin

Comyn Kelleher Tobin
Solicitors, 2 George's Quay, Cork

| | |
|---|---|
| FORM CA RECEIVED | FORM CA |
| 05 / 03 / 2017 | |
| FUNDS RECEIVED DATE | |
| 05 / 03 / 2017 | |
| EXAMINED BY  SGU | FOR COPYRIGHT OFFICE USE ONLY |
| CORRESPONDENCE | |
| REFERENCE TO THIS REGISTRATION ADDED TO BASIC REGISTRATION  ☒YES  ☐NO | |

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

Continuation of ☑ Part B or ☐ Part C

Line No. 8 under Copyright Claimant states Maron Pictures. This should be augmented to Mark Mahon.

Line No. 13 under Rights and Permissions states Maron Pictures. This should be augmented to Mark Mahon.

Line No. 14 under Certification states Maron Pictures. This should be augmented to Mark Mahon

Correspondence: Give name and address to which correspondence about this application should be sent.

Mark Mahon

Mariners Rest, Mariners View Avenue, Passage, Cork, IRELAND

Phone ( 353 )          Fax ( 353 )          Email

Deposit Account: If the registration fee is to be charged to a deposit account established in the Copyright Office, give name and number of account.

Name

Account Number

Certification*—I, the undersigned, hereby certify that I am the: (Check only one)
☑ author  ☑ owner of exclusive right(s)
☑ other copyright claimant  ☐ duly authorized agent of     Mark Mahon

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼  Mark Mahon          Date ▼ April 18, 2017

Handwritten signature (X) ▼

Certificate will be mailed in window envelope to this address:

Name ▼  Mark Mahon
Number/Street/Apt ▼  Mariners Rest, Mariners View Avenue, Passage,
City/State/ZIP ▼  Cork, IRELAND

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form CA-Full  Rev: 10/2011  Printed on recycled paper          U.S. Government Printing Office: 2011-xxx-xxx/xx,xxx

[38]

# EXHIBIT 3

































# EXHIBIT 4



*Palais de Monaco*

*Par ordre de Son Altesse Sérénissime le Prince Souverain*

*le Chambellan a l'honneur d'inviter*

Mr. & Mrs. Mark Mahon

To attend a private screening of Strength and Honour

March 17, 2010 at 8hrs.30 in the Palace, Cinema

*Tenue* Jacket no tie & 'touch of Green'

*R.S.V.P. au Chambellan - Palais Princier - B.P. 518 - MC 98015 Monaco Cedex*

*Tél. : +377 93 25 18 31 - Fax : +377 93 30 69 72 - E-mail : shonneur@palais.mc*

PRIÈRE DE PRESENTER CETTE CARTE À L'ENTRÉE



[58]



# EXHIBIT 5





# EXHIBIT 6

We certify that the within document is a true copy of the original.

# Certificate of Registration

Dated this **6** day of **Feb** 20**20**



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

Signed: *Comyn Kelleher To*

Comyn Kelleher Tobin
Solicitors, 3 Washington St, Quay, Cork

**Short Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**REGISTRATION NUMBER**

**TXu 1-289-556**

Effective Date of Registration

**3-8-06**

Application Received **MAR 0 8 2006**

Examined By **M.W.**

**MAR 0 8 2006** Two

Correspondence ☐

Fee Received

TYPE OR PRINT IN BLACK INK  DO NOT WRITE ABOVE THIS LINE.

| | | |
|---|---|---|
| **1** Title of This Work.<br><br>Alternative title or title of larger work in which this work was published | | STRENGTH AND HONOR |
| **2** Name and Address of Author and Owner of the Copyright·<br><br>Nationality or domicile<br>Phone fax and email. | | MARK MAHON<br>3, MARINERS REST, MARINERS VIEW AVENUE, PASSAGE WEST, CORK, IRELAND<br><br>Phone (353 ) 87-1260025   Fax (1770) 8185848<br>Email MAKON @ IOL IE |
| **3** Year of Creation | | 2005 |
| **4** If work has been published, Date and Nation of Publication. | | a Date _____ (Month day and year all required)<br>b Nation |
| **5** Type of Authorship in This Work<br><br>Check all that this author created. | | ☑ Text (includes fiction nonfiction poetry, computer programs etc )<br>☐ Illustrations<br>☐ Photographs<br>☐ Compilation of terms or data |
| **6** Signature<br><br>Registration cannot be completed without a signature | | I certify that the statements made by me in this application are correct to the best of my knowledge  Check one<br>☑ Author  ☐ Authorized agent<br>X _____ |
| **7** Name and Address of Person to Contact for Rights and Permissions<br>Phone fax, and email | | ☑ Check here if same as #2 above<br><br>Phone ( )          Fax ( )<br>Email |

OPTIONAL

| **8** Certificate will be mailed in window envelope to this address | Name ▼ MARK MAHON<br>Number/Street/Apt ▼ 3, MARINERS REST, MARINERS VIEW AVENUE, PASSAGE WEST,<br>City/State/ZIP ▼ CORK, IRELAND | Complete this space only if you currently hold a Deposit Account in the Copyright Office | **9** Deposit Account # _____<br>Name _____ |
|---|---|---|---|

DO NOT WRITE HERE          Page 1 of ___ pages

17 U S C § 506(e)  Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409  or in any written statement filed in connection with the application  shall be fined not more than $2,500

# EXHIBIT 7

We certify that the within docu ...nt
is a tru copy of the original.

Dated this  6  day of  February  20 20

Signed: Comyn Kelleher Tobin

Comyn Kelleher Tobin
Solicitors, 2 George's Quay, Cork

## AGREEMENT TO ACQUIRE LITERARY MATERIAL

**THIS AGREEMENT** is made on the 25th day of September 2006 by and between **MARK MAHON** (hereinafter referred to as "Owner") and **MARON PICTURES LIMITED, t/a Maron Pictures Limited Liability Company and Maron Pictures, having its registered office at Mariners Rest, Mariners View Avenue, Passage West, Cork, Ireland** (hereinafter referred to as "Purchaser") with respect to Owner's screenplay entitled "Strength and Honour". This work including all adaptations and/or versions, the titles, characters, plots, themes and storyline is collectively referred to hereinafter as the "Property".

### THE PARTIES AGREE AS FOLLOWS:

1. **RIGHTS GRANTED:** Owner hereby sells, grants, conveys and assigns to Purchaser, its successors, licensees and assigns exclusively and forever, all motion picture rights (including all silent, sound, dialogue and musical motion picture rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, any and all allied and ancillary rights, throughout the universe, in and to the Property and in and to the copyright thereof and all renewals and extensions of copyright. Included among the rights granted to Purchaser hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the universe:

   (a) To make, produce, adapt and copyright one or more motion picture adaptations or versions, whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, color or type, including, but not limited to, musical motion pictures and remakes of and sequels to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other

kinds of sound and sound effects.

(b) To exhibit, perform, rent, lease and generally deal in and with any motion picture produced hereunder:

   (i)    by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

   (ii)   in any place whatsoever, including homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including without limitation, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors

performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish and copyright or cause to be published and copyrighted in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version or adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise tie-ups and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics.

All rights, licenses, privileges and property herein granted Purchaser shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property. If Owner hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, translation or dramatization or other versions of the Property, then Purchaser shall have and Owner hereby grants to Purchaser without payment therefor all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production

based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. **RIGHTS RESERVED**: The following rights are reserved to Owner for Owner's use and disposition, subject, however, to the provisions of this agreement:

(a) **Publication Rights**: The right to publish and distribute printed versions of the Property owned or controlled by Owner in book form, whether hardcover or softcover, and in magazines or other periodicals, whether in instalments or otherwise, subject to Purchaser's rights as provided for in Clause 1 *supra*.

(b) **Stage Rights**: The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made. Owner agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or seven (7) years after the date of exercise of the purchaser's option to acquire the property, whichever is earlier.

(c) **Radio Rights**: The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 *supra* for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio. Owner agrees not to exercise, or permit any other person to exercise, Owner's radio rights earlier than five (5) years after the first general release or initial telecast, if earlier, of the first Picture produced hereunder or seven (7) years after the date of exercise of purchaser's option to acquire the property, whichever is earlier.

(d) **Author-written Sequel**: A literary property (story, novel, drama or otherwise), whether written before or after the Property and whether written by Owner, someone authorized by Owner, or by a successor in interest of Owner, using one or more of the characters

appearing in the Property, participating in different events from those found in the Property, and whose plot is substantially different from that of the Property. Owner shall have the  right to exercise publication rights; i.e., in book or magazine form, at any time. Owner agrees not to exercise, or permit any other person to exercise any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the first general release of the first Picture produced hereunder, or seven (7) years after the date of exercise of purchaser's option to acquire the property, whichever is earlier, provided such restriction on Owner's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property, plus one (1) year, which shall also be a restricted period in such country or territory, whether or not such period occurs wholly or partly during or entirely after the 5/7 year period first referred to in this clause. Any disposition of motion picture or allied rights in an author-written sequel made to any person or company other than Purchaser shall be made subject to the following limitations and restrictions:

Inasmuch as the characters of the Property are included in the exclusive grant of motion picture rights to Purchaser, no sequel rights or television series rights may be granted to such other person or company, but such characters from the Property which are contained in the author-written sequel may be used in a motion picture and remakes thereof whose plot is based substantially on the plot of the respective author-written sequel.

It is expressly agreed that Owner's reserved rights under this subclause relate only to material written or authorized by Owner and not to any revision, adaptation, sequel, translation or dramatization written or authorized by Purchaser, even though the same may contain characters or other elements contained in the Property.

3.    **RIGHT TO MAKE CHANGES**: Owner agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the sequence thereof and the characters and

Comyn Kelleher Tobin<br>
Solicitors<br>
29 South Mall<br>
Cork

5

[70]

I hereby certify that this document is a true copy of the original.

Dated this 6 day of February 2020

Signed: Comyn Kelleher Tobin

Comyn Kelleher Tobin
Solicitors, 2 George's Quay, Cork

descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other material of any kind. Owner hereby waives the benefits of any provision of law known as the "droit moral" or moral rights or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Owner's "droit moral" or moral rights or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations.

4.     **DURATION AND EXTENT OF RIGHTS GRANTED**: Purchaser shall enjoy, solely and exclusively, all the rights, licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by Owner of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world. The rights granted herein are in addition to and shall not be construed in derogation of any rights which Purchaser may have as a member of the public or pursuant to any other agreement. All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances except in the event of failure to pay the money consideration which shall be paid in full by the 30th day of September, 2015.

5.     **CONSIDERATION**: As consideration for all rights granted and assigned to Purchaser and for Owner's representations and warranties, Purchaser agrees to pay to Owner, and Owner agrees to accept:

(a) For production of a script on which a theatrical motion picture is to be based, €300,000.00 (Three Hundred Thousand Euro) payable in accordance with the terms of the related

Production, Finance and Distribution agreement entered into between the Purchaser and Strength and Honour Productions Limited of even date (hereinafter referred to as the PFD) and the Share Purchase Agreement entered into between the Purchaser and S&H Film Nominees Limited on even date. This consideration shall be paid in full no later than the 30th day of September, 2015 or all rights granted and assigned herein by Owner to Purchaser may be revoked by Owner subject to his sole discretion.

(b) Further script royalties in the amount of 40% of the surplus arising for distribution pursuant to the terms of Clause 13 (1) (b) of the PFD to be paid in accordance with the terms of that agreement.

6. **REPRESENTATIONS AND WARRANTIES:**

(a) **Sole Proprietor:** Owner represents and warrants to Purchaser that Owner is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by Owner entitled "Strength and Honour".

(b) **Facts:** Owner represents and warrants to Purchaser as follows:

    (i)    Owner is the sole author and creator of the Property.

    (ii)    No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by or on behalf of Owner.

    (iii)    Except as otherwise specified herein, none of the rights granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser.

(c) **No Infringement or Violation of Third Party Rights:** Owner represents and warrants to Purchaser that Owner has not adapted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has Owner copied or used in the Property the plot, scenes, sequence or story

of any other literary, dramatic or other material; that the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; that no material contained in the Property is libelous or violative of the right of privacy of any person; that the full utilization of any and all rights in and to the Property granted by Owner pursuant to this Agreement will not violate the rights of any person, firm or corporation; and that the Property is not in the public domain in any country in the world where copyright protection is available.

(e) **No Impairment of Rights:** Except as otherwise specified herein, Owner represents and warrants to Purchaser that Owner is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that Owner has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that Owner has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser. Owner further represents and warrants that no attempt shall be made hereafter to encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by Owner.

7. **INDEMNIFICATION:**

(a) Owner agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by Owner.

(b) Purchaser agrees to indemnify Owner against all judgments, liability, damages, penalties, losses and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Owner by reason of the development, production and distribution of any Picture produced pursuant hereto, except to the extent covered by Owner's preceding indemnity.

(c) Purchaser shall not be liable to Owner for damages of any kind in connection with any

*Comyn Kelleher Tobin*
*Solicitors*
*29 South Mall*
*Cork*

8

Picture it may produce, distribute or exhibit, or for damages for any breach of this agreement (except failure to pay the money consideration herein specified) occurring or accruing before Purchaser has had reasonable notice and opportunity to adjust or correct such matters.

(d) All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction (except failure to pay the money consideration herein specified) under any circumstances.

8. **PROTECTION OF RIGHTS GRANTED**: Owner hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of Owner, or Owner and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. Owner will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold Owner harmless from any costs, expenses, or damages which Owner may suffer as a direct result of any such suit or proceeding.

9. **COPYRIGHT**: Regarding the copyright in and to the Property, Owner agrees that:

(a) Owner will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by Owner authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United

*Comyn Kelleher Tobin*
*Solicitors*
*29 South Mall*
*Cork*

9

States or in any other country in which registration is permitted or required for copyright or similar protection, Owner will register or cause the same to be registered for copyright or similar protection in accordance with the laws and regulations of such country, and Owner further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) At least six (6) months prior to the expiration of any copyright required by this provision for the protection of the Property, Owner will renew (or cause to be renewed) such copyright, as permitted by applicable law, and any and all rights granted Purchaser hereunder shall be deemed granted to Purchaser throughout the full period of such renewed copyright, without the payment of any additional consideration, it being agreed that the consideration payable to Owner under this agreement shall be deemed to include full consideration for the grant of such rights to Purchaser throughout the period of such renewed copyright.

(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public; thus, the Purchaser may exercise any and all such rights and privileges as though this agreement were not in existence. The rights granted herein by Owner to Purchaser, and the representations, warranties, undertakings and agreements made hereunder by Owner shall endure in perpetuity (except failure to pay the money consideration herein specified) and shall be in addition to any rights, licenses, privileges or property of Purchaser referred to in this Subclause (d).

10. **CREDIT OBLIGATIONS:** Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, biography and photographs or other likenesses of Owner in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service. During the term of the Writer's Guild of America Minimum Basic Agreement ("WGA Agreement"), as it may be amended, the credit provisions of the WGA Agreement shall govern the determination of credits, if any, which

the Purchaser shall accord Owner hereunder in connection with photoplays. If Purchaser ceases to be a party to said WGA Agreement the provisions of the WGA Agreement shall no longer govern the determination of such credits.

Owner shall receive screen credit on all prints of the Picture in the main titles, on a separate card, as "Written and Directed by Mark Mahon".

Owner shall receive credit in the form and position aforesaid in any advertising where the lead cast receive credit, subject to any distributor's customary exclusions and exceptions. No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by Purchaser. Owner hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused Owner thereby is not irreparable or sufficient to entitle Owner to injunctive or other equitable relief. Consequently, Owner's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law. Purchaser agrees to provide in its contracts with distributors of the Picture that such distributors shall honour Purchaser's contractual credit commitments and agrees to inform such distributors of the credit provisions herein. Upon written notice by Owner to Purchaser of a failure or omission to provide any credit specified herein, Purchaser agrees to use its good faith efforts to remedy such failure or omission on a prospective basis.

11. **RIGHT OF FIRST NEGOTIATION**: The Term "Right of First Negotiation" means that if, after the expiration of an applicable time limitation, Owner desires to dispose of or exercise a particular right reserved to Owner herein ("Reserved Right"), whether directly or indirectly, then Owner shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right. If, after the expiration of thirty (30) days following the receipt of such notice, no agreement has been reached, then Owner may negotiate with third parties regarding such Reserved Right subject to Clause 12 *infra*.

12. **RIGHT OF LAST REFUSAL**: The term "Right of Last Refusal" means that if Purchaser and Owner fail to reach an agreement pursuant to Purchaser's right of first negotiation, and Owner makes and/or receives any bona fide offer to license, lease and/or purchase the particular Reserved Right or any interest therein ("Third Party Offer"), and if the proposed purchase price

and other material terms of a Third Party Offer are no more favourable to Owner than the terms which were acceptable to Purchaser during the first negotiation period, Owner shall notify Purchaser, by certified or registered mail, if Owner proposes to accept such Third Party Offer, the name of the offeror, the proposed purchase price, and other terms of such Third Party Offer. During the period of thirty (30) days after Purchaser's receipt of such notice, Purchaser shall have the exclusive option to license, lease and/or purchase, as the case may be, the particular Reserved Right or interest referred to in such Third Party Offer, at the same purchase price and upon the same financial terms and conditions as set forth in such notice. If Purchaser elects to exercise the right to purchase such Reserved Right, Purchaser shall notify Owner of the exercise thereof by certified or registered mail or facsimile transmission (with verification of receipt) within such thirty (30) day period, failing which Owner shall be free to accept such Third Party Offer; provided that if any such proposed license, lease and/or sale is not consummated with a third party within thirty (30) days following the expiration of the aforesaid thirty (30) day period, Purchaser's Right of Last Refusal shall revive and shall apply to each and every further offer or offers at any time received by Owner relating to the particular Reserved Right or any interest therein; provided, further, that Purchaser's option shall continue in full force and effect, upon all of the terms and conditions of this Paragraph, so long as Owner retains any rights, title or interests in or to the particular Reserved Right. Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind Owner and Owner's heirs, successors and assigns.

13. **NO OBLIGATION TO PRODUCE**: Nothing herein shall be construed to obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

14. **ASSIGNMENT**: Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any person, firm or corporation without limitation, and this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever. Owner may not assign all or any part of this Agreement,

except for a one-time assignment of the right to receive any payments due hereunder.

15. **NO PUBLICITY**: Owner will not, without Purchaser's prior written consent in each instance, issue or authorize the issuance or publication of any news story or publicity relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use of the Property by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder. This provision shall not be deemed to preclude Owner's incidental, non-derogatory mention in interviews of any Picture based on the Property.

16. **ADDITIONAL DOCUMENTATION**: Owner agrees to execute and procure any other and further instruments necessary to transfer, convey, assign and copyright all rights in the Property granted herein by Owner to Purchaser in any country throughout the world. If it shall be necessary under the laws of any country that copyright registration be acquired in the name of Owner, Purchaser is hereby authorized by Owner to apply for said copyright registration thereof; and, in such event, Owner shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by Owner. Owner further agrees, upon written request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise. If Owner shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, within five (5) business days after Purchaser's request therefor, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of Owner and as Owner's attorney-in-fact.

17. **NOTICES:** All notices to Purchaser shall be sent by registered mail, postage prepaid, or by telegram addressed to Purchaser at:

c/o Deirdre Kelleher

Director

Maron Pictures

3 Mariners Rest

Mariners View Avenue

Passage West

*Comyn Kelleher Tobin*
*Solicitors*
*29 South Mall*
*Cork*

13

Co. Cork

and all notices to Owner under this agreement shall be sent by registered mail, postage prepaid, or by telegram addressed to at:

Mr. Mark Mahon

3 Mariners Rest

Mariners View Avenue

Passage West

Co. Cork

Ireland

The deposit of such notice in the delivery of the telegram message to the telegraph office shall constitute service thereof, and the date of such deposit shall be deemed to be the date of service of such notice.

18. **RELATIONSHIP**: This agreement between the parties does not constitute a joint venture or partnership of any kind.

19. **CUMULATIVE RIGHTS AND REMEDIES**: All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

20. **WAIVER**: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

21. **SEVERABILITY**: If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such determination shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstance, or the validity or enforceability of this Agreement.

22. **GOVERNING LAW**: This Agreement shall be construed in accordance with the laws of the Ireland applicable to agreements which are executed and fully performed within said State.

23. **HEADINGS**: Headings are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

24. **ENTIRE UNDERSTANDING**: This agreement (and any exhibits attached hereto) contains
the entire understanding of the parties relating to the subject matter, and this Agreement
cannot be changed except by written agreement executed by the party to be bound.

IN **WITNESS WHEREOF**, the parties hereto have signed this Agreement as of the day and year
first above written.

MARK MAHON ("Owner")
MARON PICTURES ("Purchaser")

MARON PICTURES

We certify that the within document
is a true copy of the original.

Dated this 6 day of February 20 20

Signed: Comyn Keller

Comyn Kelleher Tobin
Solicitors, 2 George's Quay, Cork

*Comyn Kelleher Tobin*
*Solicitors*
*29 South Mall*
*Cork*

15