1

2

3  **UNITED STATES DISTRICT COURT**

4  **NORTHERN DISTRICT OF CALIFORNIA**

5

6  MARK MAHON,

7       Plaintiff,     |  OMNIBUS ORDER RE: MOTIONS TO DISMISS

8  v.

9  MAINSAIL LLC, ET AL.,      Case No. 20-cv-01523-YGR

              Dkt. Nos. 25, 37

10       Defendants.

11  v.

              Case No. 20-cv-01525-YGR

12  YOUTUBE LLC, ET AL.,

              Dkt. No. 29

13       Defendants.

14  v.

              Case No. 20-cv-01527-YGR

15  ENTERTAINMENT ONE US LP, ET AL.,

              Dkt. No. 34

16       Defendants.

17  v.

              Case No. 20-cv-01530-YGR

18  ALPHABET INC., ET AL.

              Dkt. No. 25

19       Defendants.

20  v.

              Case No. 20-cv-01534-YGR

21  APPLE INC., ET AL.,

              Dkt. No. 29

22       Defendants.

23

24     Plaintiff Mark Mahon brings five copyright infringement actions, alleging that each

25  defendant infringes Mahon's copyrights in the motion picture and screenplay titled "Strength and

26  Honor" and further infringes Mahon's Right of the Author in those works.  For Mainsail[1] and

27  _____

28     [1] The Mainsail defendants include Mainsail LLC, Shoreline Entertainment, Inc., Sam Eigen, Morris Ruskin, and Does 1 through 21 (collectively, "Mainsail").

Entertainment One,[2] plaintiff alleges additional claims, including willful copyright infringement, trafficking in illicit labels, and conversion.  Mahon alleges fraud against Mainsail only.  Each defendant now moves to dismiss plaintiff's claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Entertainment One and Apple further move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

Having considered the papers and pleadings in this action, the Court finds the motion appropriate for resolution without oral argument and the matter is deemed submitted.  Fed. R. Civ. P. 78(b); Civ. L. R. 7-1(b).  The Court **GRANTS IN PART** and **DENIES IN PART** Mainsail's and Entertainment One's motions, and **GRANTS** YouTube's, Alphabet's, and Apple's motions, with leave to amend as stated herein.

## I.   BACKGROUND

Plaintiff alleges the same background facts for each defendant.[3]

Mahon is an independent filmmaker based in Cork, Ireland.  (Mainsail Compl. ¶ 7.)  In 2005, Mahon wrote, directed, and produced the film "Strength and Honor" (the "Film"), which follows a single father who rediscovers boxing to save his young son's life.  (*Id.* ¶ 24.)  The Film has won multiple awards and received attention on the awards circuit and in the media.  (*Id.*)  To develop the film commercially, Mahon created a fully-owned production company, Maron Pictures Ltd. ("Maron Pictures"), and assigned it all literary and authorship rights in return for € 300,000 and 40% of royalties.  (*Id.* ¶ 26, Exs. 7, 8.)

In 2006, Mahon obtained U.S. copyright registrations for both the Film and the screenplay. (*Id.* ¶ 25.)  Mahon listed himself as the author and owner of the screenplay copyright but Maron

---

[2] The Entertainment One defendants include Entertainment One US LP.; Entertainment One Licensing US, Inc.; Entertainment One Ltd.; E1 Entertainment UK Ltd.; and Does 1 through 15 (collectively, "Entertainment One").

[3] The Court references the relevant paragraph numbers of the case with the lowest filing number.  *See Mahon v. Mainsail LLC*, No. 20-cv-01523, Dkt. No. 19 ("Mainsail Compl.").  Where, and when appropriate, direct references to the other complaints are made.  *See Mahon v. YouTube LLC*, No. 20-cv-1525, Dkt. No. 16 ("YouTube Compl."); *Mahon v. Ent. One US LP*, No. 20-cv-1527, Dkt. No. 1 ("Ent. One Compl."); *Mahon v. Alphabet Inc.*, No. 20-cv-1530, Dkt. No. 16 ("Alphabet Compl."); *Mahon v. Apple Inc.*, No. 20-1534, Dkt. No. 15 ("Apple Compl.").

United States District Court
Northern District of California

United States District Court
Northern District of California

Pictures as the copyright owner of the motion picture copyright.  (*See id.* Exs. 2, 6.)  In 2009, Maron Pictures entered into a distribution agreement with Mainsail, granting it the rights to distribute the Film worldwide except North America and Ireland.  (*Id.* ¶ 28.)  Mahon sent Mainsail the authorized poster and cover for distribution and sent the master elements of the Film to Visual Data Media Services, Inc. ("Visual Data")—a California company apparently devoted to digital media supply chains.  (*Id.*)  Mainsail then sub-licensed distribution rights to Entertainment One and other distributors.  (*Id.* ¶¶ 32, 36.)

However, in January 2010, the Film was released in Europe and Ireland under unauthorized covers and trailers.  (*Id.* ¶ 29.)  Ten years of litigation ensued.  Mahon sent cease-and-desist emails to Mainsail and Entertainment One, ordering them to stop distribution.  (*Id.* ¶¶ 30-32.)  Following multiple attempts at mediation and arbitration, Maron Pictures filed suit against Mainsail in the Los Angeles Superior Court.  (*Id.* ¶¶ 35-41.)  In 2016, the Superior Court found that Mainsail had stopped all licensing activities after receiving Mahon's cease-and-desist letter and denied all claims.[4]  (*Id.* ¶¶ 45, 47.)  The Superior Court further found that Maron Pictures never delivered the Film to Mainsail.[5]  (*Id.*)  Maron Pictures unsuccessfully appealed and then sought review by the Supreme Court, which was denied in 2019.  (*Id.* ¶¶ 49-53.)

Consistent with the Superior Court's findings, Mainsail never paid Maron Pictures for use of the Film, which it alleges it never used after Mahon's letter.  (*Id.* ¶ 42.)  Accordingly, Maron Pictures could not pay Mahon, and, following the contractual day of payment, Mahon revoked his rights from Maron Pictures in October 2015.  (*Id.*; *see id.* Ex. 10.)  In 2017, Mahon also filed a supplemental registration with the U.S. Copyright Office correcting authorship and ownership information in the original registration from "Maron Pictures" to himself.  (*See id.* Ex. 2.)

Despite Mainsail's representations, Mahon claims that Mainsail continued to license the Film worldwide after Mahon revoked the agreement.  (*Id.* ¶ 42.)  First, the Film continued to be

---

[4] The Superior Court did not address breach of contract or any other claim besides accounting, finding them barred by the contractual limitations period.  (*See* Dkt. No. 25-13 at 2.)

[5] The court of appeal later found "undisputed" that Maron Pictures "delivered enough items to enable defendants to license the film and earn revenue," but concluded that the superior court's finding was not clear error.  (Dkt. No. 31-9 at 28.)

shown around the world in 2016, as evidenced by Mahon's purchase of the Film from YouTube the same year.  (*Id.* ¶ 48, Ex. 35.)  Because copies of the Film could only be obtained from Visual Data, Mahon claims that the illicit distribution came from Mainsail.  (*See id.* ¶ 45.)  Second, Maron Pictures received a royalty report from Entertainment One in February 2018 showing significant Film revenues in 2017.  (Ent. One Compl. ¶ 36.)  Finally, in December 2019, Visual Data disclosed to Mahon—allegedly for the first time—that it had sent copies of the Film to Mainsail in California as late as May 2017.  (*Id.* ¶ 54, Exs. 37, 38.)

Following the Visual Data revelation, Mahon sent cease-and-desist letters to YouTube Inc., Apple Inc., and Google LLC, who had the Film available for purchase in 2019.  (YouTube Compl. ¶ 34; Apple Compl. ¶ 35; Alphabet Compl. ¶ 35.)  YouTube responded by giving Mahon a non-functioning link and advising him to file a copyright infringement complaint.  (YouTube Compl. ¶¶ 25-39.)  Apple responded by providing a non-functional link and eventually informing Mahon that the content had been taken down, but that Entertainment One US LP had previously provided it.  (Apple Compl. ¶¶ 36-40.)  Google responded by informing Mahon that the Film was no longer available through Google Play, but that it had previously obtained it from Entertainment One under license.  (Alphabet Compl. ¶ 38.)

Entertainment One contacted Mahon directly in January 2020, informing Mahon that, as he "might recall," it possessed all linear distribution rights in the Film (which include "download and streaming") under an agreement with Mainsail.  (*Id.* ¶ 36.)  Entertainment One confirmed that it had provided copies of the Film to "Google and other digital platforms" and requested that "no further action be taken against these platforms."  (*Id.*)

Mahon filed the instant complaints in March 2020.  The cases were reassigned in April, but have not yet been consolidated.  The Court shall address additional allegations as necessary in the Order.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(1)

Dismissal under Rule 12(b)(1) is warranted where plaintiff fails to establish federal subject matter jurisdiction.  A Rule 12(b)(1) motion may challenge jurisdiction in one of two ways.  *Leite*

4

*v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  First, a "facial" attack "accepts the truth of the plaintiff's allegations but asserts that they are 'insufficient on their face to invoke federal jurisdiction.'"  *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  Second, a "factual" attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings."  *Id.*  The court treats facial attacks similar to Rule 12(b)(6) motions—assuming the truth of plaintiff's allegations and drawing all inferences in favor of plaintiff—but it treats factual attacks consistent with the evidentiary standard that governs summary judgment.  *Id.*  "Dismissal for lack of subject matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy."  *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. Cty. Of Oneida*, 414 U.S. 661, 666 (1974)).

**B.     Rule 12(b)(2)**

Rule 12(b)(2) places the burden on the plaintiff to demonstrate that the court has personal jurisdiction over the defendants.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  Similar to Rule 12(b)(1) motions, a Rule 12(b)(2) motion to dismiss may test either plaintiff's allegations of jurisdiction or the facts supporting those allegations.  Where defendants' motion rests on the written materials, rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts.  *Id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).  Although plaintiff cannot rest on conclusions, "uncontroverted allegations in the complaint must be taken as true."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir 2011).  The court does not assume the truth of allegations contradicted by affidavit, but conflicts among parties' affidavits are resolved in plaintiff's favor.  *Id.*; *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588-89 (9th Cir. 1996) (citation omitted).

Substantively, "[t]here are two limitations on a court's power to exercise personal jurisdiction over a nonresident defendant:  the applicable state personal jurisdiction rule and constitutional principles of due process."  *Sher*, 911 F.2d at 1360.  California's long arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the due

United States District Court
Northern District of California

1   process clause of the United States Constitution.  Cal. Civ. P. Code § 410.10.  In addition, the

2   federal long-arm statute—codified as Federal Rule of Civil Procedure 4(k)—allows a court to

3   exercise jurisdiction over "any defendant who is not subject to the jurisdiction of the courts of

4   general jurisdiction of any state" through service of process, as long as doing so complies with due

5   process.  *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006).

6       **C.      Rule 12(b)(6)**

7           Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which

8   relief may be granted.  Dismissal under Rule 12(b)(6) is proper if there is a "lack of a cognizable

9   legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

10  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica*

11  *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The complaint must plead "enough facts to state

12  a claim [for] relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

13  (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the

14  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

15  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If the facts alleged do not support a reasonable

16  inference of liability, stronger than a mere possibility, the claim must be dismissed.  *Id*. at 678-79;

17  *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is

18  not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

19  fact, or unreasonable inferences").

20          If a court dismisses a complaint, it should give leave to amend unless "the pleading could

21  not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe, Inc. v. N. Cal.*

22  *Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

23  **III.    MAINSAIL'S MOTION TO DISMISS**

24          Mainsail moves to dismiss all claims pursuant to Rules 12(b)(6) and 12(b)(1).  Mainsail

25  alleges that Mahon fails to state a claim for causes of action arising under federal law and that the

26  Court therefore lacks subject matter jurisdiction.  Mainsail also contends that Mahon fails to plead

27

28

6

the state law claims.  The Court addresses each claim in turn.[6]

**A.    Copyright Infringement**

Mainsail moves to dismiss Mahon's copyright infringement claims on four grounds:  (1) Mahon lacks standing to bring the claims, (2) the statute of limitations bars Mahon's claims, (3) Mahon fails to allege facts sufficient to show direct infringement, and (4) Mahon fails to allege facts to show contributory infringement.

1.    *Standing to Enforce Copyright Claims*

Mainsail contends that Mahon cannot enforce the copyright infringement claims because Maron Pictures—not Mahon—own the copyrights.  Under the Copyright Act, only the "legal or beneficial owner" of an exclusive right under a copyright may bring an action for infringement of that right.  35 U.S.C. § 501(b); *Sybersound Records, Inc. v. YAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008).  Ownership of a copyright initially vests in its creator, but it may be transferred by any means of conveyance.  35 U.S.C. § 201(a),(e).  Even if a creator transfers a right, she may remain the "beneficial owner" of that right if the transferee pays royalties based on the right's exploitation.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003); *see also* H.R. Rep. No. 1476 at 159 (providing an example of "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees").

To allege ownership, Mahon attaches a supplemental registration, executed in 2017, which purports to correct the ownership information in the Film's copyright from Maron Pictures to Mark Mahon.[7]  (Mainsail Compl. Ex. 2.)  Mahon further argues that he owns the copyrights in question because the transfer agreements required Maron Pictures to pay € 300,000 to

---

[6] The parties request judicial notice of documents from the state court litigation and related appeals.  (*See* Dkt. Nos. 25-1, 35.)  The Court grants the requests—such matters are undisputed matters of public record—but only gives them their proper evidentiary weight.  *See Harris v. Cty. Of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

[7] Mainsail argues that a supplemental registration cannot be used to "reflect a change in the ownership of the copyright that occurred on or after the effective date of registration for the basic registration."  37 C.F.R. § 202.6(d)(4)(i).  The supplemental registration, however, suggests that Mahon was the legal owner at the time of the registration, not that ownership later changed.  Regardless, the Court does not address the issue here because Mahon adequately alleges to be the legal and beneficial owner of the copyrights on other grounds.

"permanently" assign the rights (which it allegedly held in trust before), and Mahon retained revocation rights when the payment was not made before September 15, 2015.

"When determining whether a contract has transferred exclusive rights, we look not just at the labels parties use but at the substance and effect of the contract." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013). Here, the agreements effected an immediate transfer— Mahon "hereby sells, grants, conveys and assigns" the rights—not a future or conditional one. (Mainsail Compl. Ex. 7 § 1, Ex. 8 § 1.) But the agreements also provided Mahon with discretion to revoke the rights, and Mahon apparently exercised that discretion in a letter in October 2015. (*See id.* Exs. 7 § 5(a), 8 § 5(a) (revocation rights); *id.* Ex. 10 (letter revoking Mainsail's rights).) Accordingly, Maron Pictures was the legal owner of motion picture rights in the Film before October 2015, but Mahon adequately alleges to be the legal owner after that date.

Moreover, Mahon appears to be a beneficial owner of the copyrights throughout the time period because the agreements entitle him to 40% royalties of the surplus arising from distribution. (*See* Ex. 7 § 5(b), Ex. 8 § 5(b).) Mahon may thus assert copyright infringement for violation of the motion picture rights to protect his economic interest in those rights.[8] *See Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997). Accordingly, the Court finds that Mahon has standing to bring copyright claims for the entire time period.

### 2.    *Statute of Limitations*

Mainsail next alleges that Mahon's claims are time-barred because all but two acts of infringement took place before 2017. Claims under the Copyright Act must be brought within three years after accrual. 17 U.S.C. § 507(b). Ordinarily, a claim accrues "when the cause of action is complete with all of the elements." *Gallardo v. DiCarlo*, 203 F. Supp. 2d 1160, 1169 n.13 (C.D. Cal. 2002). However, under the "discovery rule" followed by the Ninth Circuit, a

---

[8] In its Reply, Mainsail shifts tactics and asserts that Maron Pictures remains a co-owner who authorized its infringing activities. The Court sees no evidence for Mainsail's allegations. Even if Maron Pictures authorized Mainsail's distribution before 2015, a material breach of contract (such as the non-payment of royalties) may create rescission rights. *See Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1455 (9th Cir. 1996). In any case, the agreement excluded North America and Ireland from distribution rights.

copyright claim accrues "when a party discovers, or reasonably should have discovered, the alleged infringement." *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019). Moreover, under the "separate-accrual rule," the statute of limitations runs separately from each instance of copyright infringement. *Id.* at 1023. In case of continuous infringement, an infringer commits a new wrong "[e]ach time an infringing work is reproduced or distributed" and "[e]ach wrong gives rise to a discrete 'claim' that 'accrues at the time the wrong occurs.'" *Id.* (quoting *Petrella*, 572 U.S. at 671).

Mahon argues that his claims are timely because he litigated his contract claims against Mainsail for nine years, because he only learned of infringement in 2019, and because the most recent copyright infringement claims are timely. There is no dispute that the acts of infringement occurring after March 2017 are timely under the separate-accrual rule. Moreover, under the discovery rule, Mahon may bring a claim for violations described in Visual Data's report because the company refused to provide him information before 2019.[9] (Mainsail Compl. ¶¶ 39, 54.) However, for the remaining allegations, Mahon cannot avail himself of any tolling because he expressly alleges that he discovered the infringement before 2017. (*Id.* ¶ 48.) Accordingly, the Court finds that Mahon's claims are timely as to the allegations of infringement detailed in Visual Data's report (as well as other instances of infringement that may be uncovered in discovery). With respect to the balance, those allegations are dismissed with leave to amend in light of the Court's ruling.

### 3. *Direct Infringement*

Mainsail challenges the adequacy of Mahon's direct infringement allegations. To state a claim for direct copyright infringement, plaintiff must allege (1) ownership of a valid copyright, and (2) violation of at least one exclusive right granted to copyright holders. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017). Rights granted to copyright holders include (1) the right to reproduce the work, (2) the right to prepare derivative works, (3) the right to

---

[9] Mainsail argues that Mahon's claim is not credible because he knew the Film was being distributed in 2015 and 2016. At this stage, however, the Court considers only whether Mahon's claim is plausible, not whether it is ultimately correct. The reasonableness of Mahon's failure to discover the alleged infringement is a question of fact better tested through discovery.

United States District Court
Northern District of California

distribute copies, (4) the right to perform the work publicly, and (5) the right to display the work publicly.  17 U.S.C.A. § 106.

Here, the Visual Data report shows that Mainsail received copies of the Film in California in May 2017.  Mainsail argues that the Visual Data report only shows shipment of existing copies, not copying, but the Court finds Mahon's allegations to show plausible circumstantial evidence of direct infringement of distribution rights.  While Mainsail may have wanted to view the Film for its own benefit, it remains a company involved in distribution of media, so its requests to receive the Film—combined with allegations that the Film continued to be shown without authorization in 2019—create a plausible inference that Mainsail may have distributed the Film.[10]  Moreover, plaintiff alleges that Mainsail represented to Mahon and the Superior Court that it stopped all licensing activities for the Film in 2010, but that Mahon continued to receive royalty reports (without royalties) from Entertainment One pursuant to its agreement with Mainsail in 2018.  In these circumstances, Mahon's allegations raise a plausible inference that Mainsail continued to avail itself of its contractual rights to distribute the Film even after Mahon revoked those rights.[11]  The Court therefore finds that Mahon adequately alleges direct copyright infringement.

### 4.  *Contributory Infringement*

Mainsail moves to dismiss Mahon's contributory infringement claims because he fails to plead facts supporting this claim.  To state a claim for contributory infringement, plaintiff must allege that defendant (1) had knowledge of a third party's infringing activity and (2) materially contributed to that conduct.  *Perfect 10 v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 795 (9th Cir. 2007) (citation omitted).  Here, Mahon alleges that he asserts contributory infringement solely because he does not know the role of each defendant and seeks to preserve his right to recover from all of them.  Given the complicated relationship between the parties, and the tricky issues of extraterritoriality inherent in Mahon's claims, Mahon may proceed on this theory.

---

[10] Notably, even if Mainsail distributed the work outside the United States, the required exportation may still constitute direct infringement.  *See* 17 U.S.C. § 602(2).

[11] Mainsail argues that Mahon fails to allege copying.  But that is not required.  "Copying" in the cases cited by Mainsail is shorthand for violation of a statutory right under copyright.  *See Aurora World, Inc. v. TY, Inc.*, 719 F. Supp. 2d 1115, 1127 (C.D. Cal. 2009).

United States District Court
Northern District of California

1    Moreover, according to the complaints filed in the other actions, Entertainment One

2    admitted to Mahon that it distributed the Film to Google, iTunes, and others pursuant to its

3    agreement with Mainsail.  (*See* Alphabet Compl. Ex. 39.)  If Mainsail knowingly allowed

4    Entertainment One to perform distribution in the United States, and contributed to that

5    infringement by providing the appearance of right, Mahon may yet prove contributory

6    infringement liability.  Furthermore, Mahon adequately alleges that Mainsail directed Visual Data

7    to distribute the Film in the United States, which may also constitute direct infringement.

8    (Mainsail Compl. ¶ 54, Exs. 40-41.)  Accordingly, the Court does not dismiss Mahon's

9    contributory infringement claim.  However, to the extent the *Mainsail* Complaint is amended,

10   these additional allegations should be included to make explicit the link.

11   In summary, the Court **DENIES** Mainsail's motion to dismiss on the copyright claims.

12   **B.      Right of the Author**

13   Mainsail next moves to dismiss Mahon's right of the author claims.  Rights of the author

14   are not traditionally recognized in U.S. Copyright Law.  *See Garcia v. Google, Inc.*, 786 F.3d 733,

15   746 (9th Cir. 2015).  However, in 1988, the United States ratified the Berne Convention, which

16   protects certain author rights against "distortion, mutilation, or other modification of . . . [a] work,

17   which shall be prejudicial to [the author's] honor or reputation."  Berne Convention for the

18   Protection of Literary and Artistic Works, art. 6*bis*, Sept. 9, 1886, *as revised at* Paris on July 24,

19   1971, S. TREATY DOC. No. 99-27 (1986).  As Congress subsequently made clear with the Berne

20   Convention Implementation Act ("BCIA"), the Berne Convention is not self-executing—meaning

21   that Congress must enact laws to implement the convention.  *See* 3 David Nimmer & Melville B.

22   Nimmer, *Nimmer on Copyright ("3 Nimmer")* § 8D.02[C] (1996); Pub. L. No. 100-568 § 2(2).

23   Moreover, adherence to the Berne Convention, without more, expressly "does not expand or

24   reduce any right of an author."  Pub. L. No. 100-568 § 3(b).

25   In 1990, Congress—independent of the Berne Convention—passed the Visual Artists

26   Rights Act of 1990 ("VARA").  Pub. L. 101-650 § 603(a).  VARA provided *limited* author rights

27   to authors of "a work of visual art."  17 U.S.C. § 106A(A)(a).  The Act defines "visual art" to

28   mean "a painting, drawing, print, or sculpture" or a "still photographic image," but not posters or

11

1    motion pictures.  17 U.S.C. § 101; *see Garcia*, 786 F.3d at 746 ("Motion pictures specifically are

2    excluded from moral rights protection.").  The Supreme Court has interpreted Congress's limited

3    provision of author rights in VARA to preclude similar rights in non-eligible works under other

4    statutes.  *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34-35 (2003)

5    (holding that the Lanham Act does not create rights of the author in non-visual art).  Accordingly,

6    "[e]xcept for a limited universe of works of visual art . . .  United States copyright law generally

7    does not recognize moral [author] rights."  *Garcia*, 786 F.3d at 746; *see also Fahmy v. Jay-Z*, 908

8    F.3d 383, 390-91 (9th Cir. 2018).

9         Here, Mahon seeks to assert author rights under VARA, BCIA, and the Berne Convention.

10   For the reasons stated above, VARA does not protect Mahon's works:  none of the Film, the

11   screenplay, the posters, or the trailer constitute "visual art" eligible for protection under the statute.

12   *See* 17 U.S.C. § 101 (defining "visual art" to exclude motion pictures and posters).  Similarly, as

13   explained above, the Berne Convention is not self-executing and does not confer an independent

14   cause of action.  *See* 17 U.S.C. § 104(c); *Fahmy*, 908 F.3d at 391; *see also Elsevier B.V. v.*

15   *UnitedHealth Grp., Inc.*, No. 09 Civ. 2124 (WHP), 2010 WL 150167, at **1-4 (S.D.N.Y. Jan. 14,

16   2010) (surveying law to conclude Berne Convention is not self-executing).

17        Finally, under BCIA, Mahon argues that the provision stating that the Berne Convention

18   "shall be given effect" under Title 17 or "any other provision of Federal or State law, including the

19   common law," empowers the Court to create common law recognizing the right of the author.

20   Pub. L. No. 100-568 3(a)(1).  Federal common law "plays a necessarily modest role under a

21   Constitution that vests the federal government's 'legislative Powers' in Congress and reserves

22   most other regulatory authority to the States."  *Rodriguez v. Fed. Deposit. Ins. Corp.*, 140 S. Ct

23   713, 717 (2020).  Generally, federal common law is only appropriate where "a federal rule of

24   decision is necessary to protect uniquely federal interests" or where "Congress has given the

25   courts the power to develop substantive law."  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451

26   U.S. 630, 640 (1981) (citations and internal quotation marks omitted).  For example, the Supreme

27   Court has held that the Sherman Act permits federal courts to create common law because the

28   legislative history reveals intent for the courts to "give shape to the statute's broad mandate."  *Id*.

United States District Court
Northern District of California

(quoting *Nat'l Soc. Of Prof. Eng'rs v. U.S.*, 435 U.S. 679, 688 (1978)).

Here, on the other hand, no federal interests are at play and the legislative history demonstrates intent to limit author rights unless otherwise provided by Congress.  BCIA expressly states that the Berne Convention and United States' adherence to the convention "do[] not expand or reduce any right of an author."  Pub. L. No. 100-568 § 3(b).  The legislative history reveals that Congress considered the impact of author rights in the Berne Convention and declined to amend the Copyright Act to enact that provision.  *See Friedman v. Zimmer*, No. CV 15-502 GHK (Ex), 2015 WL 6164787, at *6 (C.D. Cal. July 10, 2015).  Moreover, Congress passed VARA shortly after passing BCIA, which provides a comprehensive legislative scheme for limited author rights.  *See id.*; 3 Nimmer § 8D.02[D][3].  If the Court were to find that author rights extend beyond visual art protected by VARA, it would render the limitations of that statute concerning eligible works superfluous.  *Cf. Dastar*, 539 U.S. at 34; *NW Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451 U.S. 7797 (1981) ("The judiciary may not, in the face of [] comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.").  In these circumstances, the Court finds that BCIA does not grant it power to fashion common law that recognizes author rights not otherwise provided by statute.[12]

Accordingly, the Court **GRANTS** Mainsail's motion to dismiss Mahon's right of author claims.  Given the statutory structure, any amendment of this claim appears futile.  Leave to amend is not granted.

### C.   Illicit Trafficking

Mainsail next moves to dismiss Mahon's illicit label trafficking claim because (1) Mahon lacks standing, (2) Mahon fails to show that the covers were counterfeit or illicit, and (3) the claim is time-barred.  With regard to the first issue, 18 U.S.C. § 2318(e)(1) gives a private right of action to "[a]ny copyright owner who is injured, or is threatened with injury," by a violation of the statute.  Although the statute does not distinguish between legal and beneficial owners, the Court

---

[12] Mahon requests that the Court, in the alternative, declares that the United States is not in compliance with the Berne Convention.  Given the complexity of the issue, and the interplay with the International Court of Justice, the Court declines to do so in this context.  *See* 3 Nimmer § 8D.02[D][2].

United States District Court
Northern District of California

finds that Mahon has standing to bring the claim for the reasons stated in Section III.A.1, *supra*. The remaining issues are addressed below.

### 1. *Counterfeit or Illicit Labels*

The Anti-Counterfeiting Act, codified as 18 U.S.C. § 2318, prohibits trafficking of "counterfeit" and "illicit" labels.  18 U.S.C. § 2318(a)(1).  A "counterfeit label" means "an identifying label or container that appears to be genuine, but is not."  18 U.S.C. § 2318(b)(1).  An "illicit label" means a labeling component that is "used by the copyright owner to verify that [the work] is not counterfeit or infringing" and that is used without authorization to distribute another work or else the same work in greater quantities or to more users than authorized.  18 U.S.C. § 2318(b)(4).  For example, a fake or misapplied software key used to verify software registration may be an illicit or counterfeit label.  *See Synopsis, Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO, 2017 WL 3485881, at *9 (N.D. Cal. Aug. 15, 2017).

Here, Mahon alleges that Mainsail attached unauthorized posters to promote and distribute the Film because Mainsail, instead of Maron Pictures, created them (i.e., Mainsail was not using the posters and covers that had been originally sent to it).  Since Mahon does not allege using the posters to verify that the work is not counterfeit or infringing, the labels are not "illicit" and, at best, must be "counterfeit."[13]  During the passage of the Act, the Report of the Committee of the Judiciary explained counterfeit labels as follows:

> The committee also wishes to clarify that the definition of a 'counterfeit label' includes any component of the entire package of a tape, videocassette or sound recording, such as album covers, sleeves, jackets, and containers. The definition also covers the situation where counterfeiters have simulated 'genuine' labels that have not previously existed. These simulated labels have the same basic criminal purpose as any other counterfeit product — they are designed to defraud the consumer with regard to the authenticity or source of the product. For example, cases have arisen where a counterfeiter has produced packages and distributed videotapes of a film which have never been released in that form to the public. The term 'counterfeit label' includes such simulated labels.

(S. Rep. No. 97-273, at 9 (1981).)  Subsequent to the Act's passage, multiple courts have found

---

[13] Mahon misreads the statute to allege that the unauthorized covers were "illicit" because the authorized covers were *not* used.  That is not correct, but Mahon nevertheless states a claim for counterfeit labeling under section 2318(b)(1).

14

that attaching unauthorized art to genuine copies of a copyrighted work may violate the statute. *See, e.g.*, *U.S. v. Teh*, 535 F.3d 511, 520 (6th Cir. 2008) (affirming district court judgment of counterfeit labeling where defendants labeled DVD motion picture copies with "poor quality" covers); *Cleopatra Records, Inc. v. Inspired Studios, Inc.*, No. LA CV15-00915 JAK (AGRx), 2015 WL 12426147, at **4-7 (C.D. Cal. Oct. 8, 2015) (denying motion to dismiss where company distributed music records with modified artwork); *Microsoft Corp. v. Pronet Cyber Techs., Inc.*, 593 F. Supp. 2d 876, 882 (E.D. Vir. 2009) (granting summary judgment for counterfeit labelling where defendant made his own labels for product keys that seemed genuine but were not "because Teshome, not Microsoft, created them"); *U.S. v. Robinson*, No. 4:06-CR-086-SPM, 2007 WL 2459237, at *5 (N.D. Fla. Aug. 24, 2007) (finding a defendant found to have "copies of printed, counterfeit labels laying on the printer" guilty under the statute).

Mainsail claims that Mahon's allegations do not amount to "counterfeit" labeling, but provides no explanation. As alleged in the complaint, the Film was distributed in 2010 using posters that incorrectly (and offensively) referred to the Film as a "Brit Flick" and that failed to feature the lead actor on the cover, using the photograph of a supporting actor instead. (Mainsail Compl. ¶ 32, Ex. 15.) Mahon adequately alleges that these acts amounted to counterfeit labeling because Mainsail "simulated 'genuine' labels" and trafficked in covers that "appeared to be genuine, but were not." *See* S. Rep. No. 97-273 at 9. Accordingly, the Court finds that Mahon adequately alleges a claim under 18 U.S.C. § 2318.

### 2. *Statute of Limitations*

Mainsail nevertheless argues that Mahon's illicit or counterfeit labeling claim is time-barred because the conduct is alleged to have occurred in 2010. Section 2318 requires claims under the statute to be brought within three years "after the date on which the claimant discovers the violation of subsection (a)." 18 U.S.C. § 2318(e)(6). Mahon alleges that he discovered that the Film was released under the unauthorized covers in 2010. (Mainsail Compl. ¶ 29.) Although he does not allege any further use of unauthorized covers or posters, the complaint shows that an unauthorized poster was displayed when Mahon purchased the film on YouTube in 2016. (*Id.* ¶ 48, Ex. 35.) Moreover, the unauthorized posters were apparently used when Mahon purchased the

1  Film from iTunes, YouTube, and Google Play in 2019.  (*See* Apple Compl. Ex. 32; YouTube

2  Compl. Ex. 32; Alphabet Compl. Ex. 35.)

3        Accordingly, the only timely claims for illicit or counterfeit label trafficking come from

4  Mahon's purchases of the Film from the Internet companies in 2019.  Mahon adequately alleges

5  that those copies and covers came from Entertainment One, but he does not allege that they also

6  came from Mainsail, and therefore fails to state a timely claim violations against Mainsail.  In the

7  *Mainsail* complaint, Mahon fails to allege any trafficking act within three years of discovery.

8        Mahon's arguments to the contrary do not persuade.  The discovery rule is inapplicable—

9  section 2318(e)(6) expressly states that the statute of limitations runs from the time of discovery of

10  the claim.  Continuous accrual, even if it applied to the federal claim, would not make Mahon's

11  claim timely because he fails to allege that the "last" act of any violation happened within three

12  years.  *See Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1192 (2013); *see also* 3 Nimmer

13  § 12.05(c) (no continuing violation for copyright claims (citing *Petrella v. Metro-Goldwyn-Mayer,*

14  *Inc.*, 572 U.S. 663, 671-72 (2014))).  Separate accrual fails for the same reason.

15        Finally, fraudulent concealment—a species of equitable tolling that is read into every

16  federal statute of limitation[14]—does not help Mahon because he alleges to have discovered the

17  facts constituting his claim against Mainsail in 2010.  *See Fahmy v. Jay-Z*, 835 F. Supp. 2d 783,

18  791 (C.D. Cal. 2011) (no equitable tolling where "plaintiff admits he had knowledge of the factual

19  basis of his claim no latter December 2000, and ignorance of the law or difficulty in bringing suit

20  are not grounds for equitable tolling"); *see also Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1092-97

21  (C.D. Cal. 2016).  *Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996) is instructive.  There, plaintiff

22  argued that defendants actively concealed their racketeering activity by perjuring themselves in

23  depositions to hide their pattern of conduct.  *Id.* at 514.  The court found that defendants' failure to

24  "own up" to the illegal conduct does not constitute fraudulent concealment because plaintiff was

25  aware of the *facts* that led to the claim.  *Id*.  The same result follows here:  although Mainsail

26  represented to Mahon and the Superior Court that it stopped licensing the Film in 2010, Mahon

27

28       [14] *Petrella*, 572 U.S. at 681.

1    admits that he knew of the facts that led to his claims in 2015 and 2016.  Accordingly, equitable

2    tolling does not apply in this case.

3        Thus, because Mahon fails to allege that the unauthorized posters shown for his iTunes,

4    Google Play, and YouTube purchases came from Mainsail—the Court **GRANTS** dismissal for the

5    illicit or counterfeit trafficking claim.  Leave to amend is granted to the extent that any specific

6    claims within the statute of limitations can be alleged.

7        **D.    Fraud**

8        Mainsail moves to dismiss Mahon's fraud claim on the grounds that (1) 18 U.S.C. § 1343

9    does not provide a private right of action, (2) the statute of limitations bars Mahon's claims, (3)

10   Mahon fails to plead fraud with particularity under Rule 9, and (4) Mahon's allegations are

11   premised on inactionable "intrinsic" fraud.

12       As an initial matter, the Court finds that 18 U.S.C. § 1343—the wire fraud statute—does

13   not provide a private right of action.  Mahon's claim should have been brought as common law

14   fraud, which has a three-year statute of limitations in California.  Cal. Civ. Code P. § 338(d).  In

15   his opposition, however, Mahon changes theories and alleges that his claim is proper under the

16   Racketeer Influenced and Corrupt Organizations (RICO) Act, which defines prohibited acts to

17   include acts prohibited by the wire fraud statute, the criminal copyright statute, and the trafficking

18   in counterfeit or illicit labels statute.[15]  18 U.S.C. § 1961(1).  Mahon claims that Mainsail violated

19   these statutes by virtue of representing the Superior Court that it stopped licensing activity after

20   receiving a cease-and-desist letter from Mahon.  Mainsail disagrees and contends that such

21   conduct constitutes inactionable "internal fraud."

22       The Court does not address the parties' disputes—Mahon's claim is far too confusing,

23   contradictory, and different in briefing from the complaint.  Should Mahon amend the complaint

24   to reallege this claim, Mahon is advised to plead *with particularity* the exact statutes that Mainsail

25

26       [15] Plaintiff has pled nothing remotely close to a claim for civil RICO claim which requires
     allegations of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5)
27   causing injury to plaintiffs' business or property."  *Ove v. Gwinn*, 264 817, 825 (9th Cir. 2001);
     *see City of Almaty v. Khrapunov*, 956 F.3d 1129, 1132-34 (9th Cir. 2020) (explaining
28   requirements of "business or property"); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 939-42
     (N.D. Cal. 2013) (explaining requirements for an "enterprise" separate from a "person").

United States District Court
Northern District of California

is alleged to have violated, the exact actions or statements that he alleges to be fraudulent, and the precise reasons for why they are fraudulent.

Accordingly, the Court **GRANTS** Mainsail's motion to dismiss the fraud claim, with leave to amend.

### E.   Conversion

Mainsail last moves to dismiss the conversion claim for failure to state a claim and pursuant to the statute of limitations.  Because the Court finds that Mahon's conversion claim is preempted by the Copyright Act, it does not address the instant disputes.  *See infra* Section IV. The Court **GRANTS** Mainsail's motion to dismiss the conversion claim, with leave to amend.

**********

For the foregoing reasons, the Court **GRANTS** Mainsail's motion to dismiss Mahon's right of author, counterfeit label trafficking, fraud, and conversion claims, but **DENIES** the motion as to the direct and contributory copyright claims under Rule 12(b)(6).  The Court **DENIES** Mainsail's motion to dismiss under Rule 12(b)(1) because Mahon pleads copyright infringement.[16]

### IV.   ENTERTAINMENT ONE'S MOTION TO DISMISS

Entertainment One moves to dismiss Mahon's claims on five grounds:  (1) lack of personal jurisdiction over the foreign and non-California defendants,[17] (2) extraterritoriality as to allegations of copyright infringement, (3) no recovery under the right of author, (4) failure to state a claim for illicit or counterfeit label trafficking, and (5) preemption and statute of limitations for the conversion claim.

---

[16] Mahon seeks leave to file a supplemental response to address certain *ad hominem* statements in Mainsail's reply.  (Dkt. No. 37.)  The request is **DENIED**.  The parties are advised to limit their briefing to the substantive issues in the case—any personal or accusatory statements will be disregarded.

[17] The foreign and non-California defendants include Entertainment One US LP, a Delaware limited partnership; Entertainment One Ltd., a Canadian corporation; and E1 Entertainment UK Ltd., a UK corporation.

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.      Personal Jurisdiction

Entertainment One moves to dismiss for lack of personal jurisdiction over the foreign and non-California defendants.  A court may exercise either "general" or "specific" jurisdiction over a defendant.  *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995).  Mahon asserts that both types of jurisdiction are proper here—general jurisdiction based on an "alter ego" theory of liability and specific jurisdiction based on minimum contacts.  The Court addresses each.[18]

#### 1.      *General Jurisdiction*

General jurisdiction allows a court to hear "any and all claims" against a defendant whose contacts with the jurisdiction are "so 'continuous and systematic' as to render them essentially at home in the forum State."  *Mavrix Photo*, 647 F.3d at 1223 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Generally, "[t]he existence of a parent-subsidiary relationship is insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for the purpose of establishing personal jurisdiction."  *Ranze v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015).  An exception exists for corporate "alter egos" where the parent and subsidiary "are 'not really separate entities,'" which allows one company's jurisdictional contacts to be imputed to the other.  *Id*. at 1071.  To establish jurisdiction under the alter ego test, plaintiff must show "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) the failure to disregard their separate identities would result in fraud or injustice."  *Id*. at 1073 (citation and internal brackets omitted).

Here, Mahon makes a conclusory allegation that the defendants are alter egos of each other.  But Mahon does not analyze the degree of control by one corporation over the other, the observation of corporate formalities, undercapitalization, the free transfer of records, or any other factor that the Ninth Circuit generally considers under the alter ego test.  *See In re Boon Global Ltd.*, 923 F.3d 643, 653-54 (9th Cir. 2019).  Mahon does not even explain which corporation is alleged to control which other and does not identify the corporate "alter ego" that allegedly

---

[18] Mahon also alleges that personal jurisdiction is proper under the federal long-arm statute over the foreign defendants.  Because Mahon cannot show that exercising personal jurisdiction would comply with due process, for the reasons stated herein, jurisdiction under Rule 4(k) fails.

1   committed the infringing acts.  Such conclusory allegations are not sufficient to establish general

2   jurisdiction under the alter ego test.  *Id*. at 654.  Based on the allegations of the complaint, the

3   basis for general jurisdiction fails.

4                           2.     *Specific Jurisdiction*

5          Specific jurisdiction allows the court to hear claims arising out of, or related to,

6   defendant's "minimum contacts" with the forum.  *Mavrix Photo*, 647 F.3d at 1227.  In this Circuit,

7   specific jurisdiction is analyzed under a three-prong test:  (1) the defendant must "purposefully

8   direct his activities or consummate some transactions with the forum or resident thereof" *or* must

9   "purposefully avail[] himself of the privilege of conducting activities in the forum, thereby

10  invoking the benefits an protections of its laws"; (2) the claim must "arise[] out of or relate[] to the

11  defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair

12  play and substantial justice, i.e. it must be reasonable."  *Id*. at 1227-28 (quoting *Schwarzenegger*,

13  374 F.3d at 802).  Plaintiff has the burden to establish the first two prongs.  *Id.* at 1228.  If plaintiff

14  satisfies the first two prongs, the burden shifts to the defendant to make a "compelling case"

15  against jurisdiction under the third prong.  *Id*.

16         "Purposeful direction" and "purposeful availment" under the first prong constitute

17  alternative elements, with claims sounding in tort typically evaluated under "purposeful direction,"

18  while claims sounding in contract typically evaluated under "purposeful availment."  *See id*.

19  Copyright claims are typically evaluated under "purposeful direction" using the "effects" test

20  established in *Calder v. Jones*, 465 U.S. 783 (1984).  *Id*.  The "effects" test asks whether

21  defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing

22  harm that the defendant knows it is likely to be suffered in the forum state."  *Id*.

23         Here, Mahon relies on two allegations to support specific jurisdiction:  first, Mahon alleges

24  that Mainsail and Entertainment UK Ltd selected California law as the governing law for their UK

25  distribution contract; second, Mahon alleges that copies of the Film distributed by Entertainment

26  One abroad came from illicit copying by Visual Data.  Neither of these allegations are sufficient.

27  Merely selecting governing law does not, without more, establish jurisdiction.  *See Burger King*,

28  471 U.S. at 482.  Here, the contract as a whole focuses on distribution within the United

United States District Court
Northern District of California

1    Kingdom—not California—and both parties are located outside California, which fails to show

2    more than an attenuated connection to this jurisdiction.  *See id.*  Furthermore, even if the alleged

3    illicit copies of the Film came from Visual Data located in this jurisdiction, the subsequent

4    distribution was not directed to California, but to Europe.  The act of obtaining the Film from

5    Visual Data therefore does not constitute an "action taking place outside the forum directed at the

6    forum," but the reverse.  *See Pebble Beach*, 453 F.3d 1155.

7           Accordingly, Mahon has not sufficiently alleged minimum contacts of the foreign and non-

8    California defendants with this District to establish personal jurisdiction.

9                        3.    *Jurisdictional Discovery*

10          Notwithstanding the above, the Court finds that it cannot determine personal jurisdiction

11   without additional discovery.  District courts have jurisdiction to determine their own jurisdiction.

12   *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977).  Under that

13   power, courts have discretion to allow discovery "where pertinent facts bearing on the question of

14   jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary."

15   *Id.* (citation omitted); *see, e.g.*, *Baker v. Wehinger*, No. CV 18-05800 SJO (Ex), 2018 WL

16   6443086, at *8 (C.D. Cal. Oct. 9, 2018).  Plaintiff need only establish a "colorable basis" that

17   discovery "might well demonstrate" jurisdictionally relevant facts to obtain discovery.  *Calix*

18   *Networks, Inc. v. Wi-Lan, Inc.*, No. C -09-06038 CRB (DMR), 2010 WL 3515759, at **3-7 (N.D.

19   Cal. Sept. 8, 2010) (summarizing Ninth Circuit cases).

20          Here, the Court finds the facts controverted and in need of further discovery.  First, Mahon

21   has established a colorable basis that discovery "may well demonstrate" personal jurisdiction over

22   Entertainment One US LP.  Mahon alleges that Apple specifically identified Entertainment One

23   US LP as the iTunes provider of the Film.  (Apple Compl. ¶ 39, Ex. 41.)  The Court finds it

24   plausible that Entertainment One US LP—a Delaware corporation—may have provided the Film

25   to California-based Apple, Google, and YouTube in this District, even if copies of that Film were

26   later exported abroad.  The act of distributing the Film to the technology companies in this District

27   may establish minimum contacts for purposes of personal jurisdiction over Entertainment One US

28   LP.  *See Dr. JKL Ltd. v. HPC IT Edu. Ctr.*, 749 F. Supp. 2d 1038, 1047 (N.D. Cal. 2010).

United States District Court
Northern District of California

21

1    Second, although Entertainment One denies that its corporate entities are alter egos, it does

2    not explain the role of each subsidiary or their relation for purposes of distribution.  This failure

3    creates a mystery as to why the technology companies obtained their copies of the Film from

4    Entertainment One US LP, even though the Film was allegedly distributed in Europe.  Notably, if

5    Entertainment One US LP acted as an agent for the foreign defendants when providing the Film to

6    the technology companies, jurisdiction over the parent company may follow.  *See Williby v.*

7    *Hearst Corp.*, No. 5:15-cv-02537 EJD, 2017 WL 1210036, at *4 (N.D. Cal. Mar. 2017).  And

8    under Rule 4k, jurisdiction over the foreign defendants may be proper if Mahon's claims arise

9    from their minimum contacts with the United States and no other state has personal jurisdiction.

10   *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1072 (9th Cir. 2017).  The Court

11   therefore finds a "more satisfactory showing of the facts necessary" to determine defendants'

12   respective roles in distribution of the Film before jurisdiction may be determined.

13   Accordingly, the Court **GRANTS** the motion to dismiss with leave to amend after a short

14   period of limited discovery into (1) whether Entertainment One US LP or another foreign

15   defendant provided copies of the Film to Apple, Google, and YouTube in this District, (2) whether

16   any licensing activity took place in this District, (3) the corporate structure and role in domestic

17   and foreign distribution of the Film by the Entertainment One defendants, and (4) whether

18   Entertainment One US LP acted as an agent of any parent company in providing the Film to

19   Apple, Google, and YouTube.

20   **B.    Copyright Claims**

21   Entertainment One moves to dismiss Mahon's direct and contributory infringement claims

22   on the ground of extraterritoriality.  The Copyright Act does not extend "to acts of infringement

23   that occur entirely overseas."  *Subafilms, Ltd. v. MGM-Pathe Comm'n Co.*, 24 F.3d 1088, 1097

24   (9th Cir. 1994) (en banc).  To state a claim for copyright infringement, plaintiff must allege that at

25   least one act of infringement was completed entirely in the United States.  *See L.A. News Serv. v.*

26   *Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991-92 (9th Cir. 1998) (citing *Allarcom Pay*

27   *Television Ltd. v. Gen. Instr. Corp.*, 69 F.3d 381, 387 (9th Cir. 1995)).  However, where an act of

28   infringement takes place in the United States and enables further exploitation abroad, plaintiff may

United States District Court
Northern District of California

22

1    recover damages for extraterritorial exploitation.  *Id.*; *see also* 5 Nimmer § 17.02 (explaining

2    predicate act doctrine).  *But see L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 340 F.3d 926,

3    931 (9th Cir. 2003) (limiting recovery to defendant's profits).

4            Here, Mahon alleges that the predicate act of Entertainment One's exploitation of the Film

5    in Europe arose from the United States:  Visual Data had copied the Film in California to enable

6    distribution by Entertainment One in Europe.  However, that is insufficient to state a claim against

7    Entertainment One.  Mahon does not allege that Entertainment One either participated in or

8    contributed to Visual Data's infringement.  Generally, a predicate act arising from a third party

9    does not create liability for a party that merely benefits.  *See L.A. News Serv.*, 149 F.3d at 991

10   (finding liability where *defendants* committed predicate act of copying); *Sheldon v. Metro-*

11   *Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1934) (same).

12           That said, Mahon does allege that Apple obtained a copy of the Film from Entertainment

13   One US LP.  For the reasons stated in Section IV.A.3, *supra*, the Court finds it plausible that

14   Entertainment One US LP provided the Film to the technology companies in the United States.

15   The act of providing the Film may constitute direct infringement if it violated the right to

16   distribution or if it required copying of the Film.  *See L.A. News Serv. v. Reuters Television Int'l,*

17   *Ltd.*, 942 F. Supp. 1265, 1269-70 (C.D. Cal. 1995), *rev'd in part on other grounds* 149 F.3d 987.

18   Alternatively, exporting illicit copies of the Film abroad may also state a claim for copyright

19   infringement.  17 U.S.C. § 602(a)(2).

20           Accordingly, the Court does not dismiss the copyright infringement claims

21           **C.      Right of Author**

22           Entertainment One moves to dismiss Mahon's right of author claims on the ground that

23   federal law does not protect such rights for motion pictures.  For the reasons stated in Section

24   III.B, the Court agrees and **GRANTS** Entertainment One's motion to dismiss this claim without

25   leave to amend.

26           **D.      Illicit Trafficking**

27           Entertainment One moves to dismiss the illicit trafficking claim on the ground that the

28   unauthorized covers and posters accurately identified the genuine Film.  But in doing so,

United States District Court
Northern District of California

1    Entertainment One relies on the wrong law—the Lanham Act instead of the Anti-Counterfeiting

2    Act.  The definition of "counterfeit label" differs from the definition of "counterfeit mark" in

3    trademark law.  *Compare* 18 U.S.C. § 2318(b)(1), *with* 18 U.S.C. § 1127.  Most obviously, a

4    counterfeit label is not a (trade) mark.  The chief harm of trademark infringement—confusion

5    between genuine and counterfeit goods—thus does not directly apply to counterfeit labels.

6              Instead, Congress chose to criminalize and impose civil liability for trafficking in

7    counterfeit labels regardless of their use with genuine articles.  *See* 18 U.S.C. § 2318(b)(1)

8    (imposing no requirement for counterfeit marks to be used with particular goods, in contrast to

9    "illicit" labels); *see also* S. Rep. No. 97-273 at 9 (expressing intent that the statute apply where "a

10   counterfeiter has produced packages and distributed videotapes of a film which have never been

11   released in that form to the public").  Accordingly, Mahon states a claim for trafficking in

12   counterfeit labels even though the labels were used with genuine copies of the Film.  *See*

13   *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (finding that

14   distribution of counterfeit volume keys with genuine software violates statute); *see also Cleopatra*

15   *Records*, 2015 WL 12426147, at *7 (explaining that counterfeit labeling may mislead consumers

16   as to branding, authorization, or licensing).

17             Entertainment One also moves to dismiss based on the statute of limitations.  As described

18   in Section III.C.2, Mahon adequately alleges that the Film was distributed under unauthorized

19   covers in December 2019.  (*See* Apple Compl. Ex. 32; YouTube Compl. Ex. 32; Alphabet Compl.

20   Ex. 35.)  Mahon also alleges that Apple informed Mahon that it received its copies of the Film—

21   and, presumably, the covers—for distribution in 2019 from Entertainment One US LP.  (Ent. One

22   Compl. ¶ 40, Ex. 41.)  Finally, Mahon alleges that Entertainment One sent him royalty reports in

23   February 2018 showing revenue from the Film's distribution.  (*Id*. ¶ 36, Ex. 34.)  Taken together,

24   the Court finds that Mahon adequately alleges that Entertainment One trafficked in counterfeit

25   labels in the United States within the statute of limitations period.

26             //

27

28

United States District Court
Northern District of California

24

E.      **Conversion**

Entertainment One moves to dismiss the conversion claim on the ground of preemption. State law claims are preempted by the Copyright Act if (1) the rights are "equivalent" to those protected by the Copyright Act, and (2) the work qualifies as protected subject matter under the Act.  *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998); *see* 17 U.S.C. § 301. Generally, claims for intangible property conversion are preempted, while those based in tangible property are not.  *See* 3 Nimmer § 1.15[I][1-2]; *Oddo v. Ries*, 743 F.2d 630, 636 (9th Cir. 1984). However, a claim for conversion of intangible property that includes an "extra element," such as demand for return of tangible property, is not preempted.  *See Ashakyan v. X17, Inc.*, No. CV 16-04305 TJH (RAOx), 2017 WL 8181026, at *3 (C.D. Cal. May 30, 2017); *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1130 (N.D. Cal. 2001).  Nonetheless, the copyright owner must actually own the tangible property in question—intellectual property rights do not "clothe [a] writer with authority to march into the local Barnes & Noble and take a copy [of her book] without paying for it."  *Carson v. Dynergy, Inc.*, 344 F.3d 446, 457 (5th Cir. 2003).

Here, Mahon alleges conversion of his rights under copyright pursuant to 17 U.S.C. § 106. These rights are not only equivalent but exactly the same as rights protected by the Copyright Act. Moreover, the work at issue, the Film, falls squarely within 17 U.S.C. § 102(6).  To the extent that Mahon asserts conversion of *tangible* property (e.g., DVDs), he fails to allege that he owns that property.  Mahon claims that Entertainment One took his "personal property," by which he seems to refer to the right of the author, but as explained in Section III.B, federal law does not protect such rights.  Mahon's case citation for protecting such rights involves rights to privacy, publication, and defamation—not rights of the author.  *See Dadoub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995) (citing *P.I.T.S. Films v Laconis*, 588 F. Supp. 1383 (E.D. Mich 1984) (discussing rights to privacy, publicity, and defamation, among others)).

Accordingly, the Court finds that the Copyright Act preempts Mahon's conversion claim and **GRANTS** Entertainment One's motion to dismiss the claim, with leave to amend to the extent that Mahon can allege conversion of tangible property.

**V.   YOUTUBE'S MOTION TO DISMISS**

YouTube moves to dismiss Mahon's complaint on the grounds that (1) it pleads no facts showing copyright infringement by YouTube, and (2) right of the author is not a recognized cause of action in the United States.

As to the first ground, Mahon alleges that the Film was available for rental on YouTube in 2019, well within the limitations period.  (YouTube Compl. ¶ 34; Exs. 32, 33.)  However, Mahon only alleges purchasing the Film in euros and makes no allegations that the Film was available for purchase in the United States.  On the contrary, Mahon's letter to YouTube expressly states that the Film was available "on your platform in Ireland, the United Kingdom, and Europe"—not the United States.  (*Id.* Ex. 37.)  Nor does Mahon allege that YouTube participated in or contributed to Visual Data's copying of the Film in the United States.  Accordingly, because the alleged act of infringement took place extraterritorially, Mahon fails to state a claim for copyright infringement.

As to the second ground, for the reasons stated in Section III.B, *supra*, the Court finds that United States law does not recognize the right of the author.  Accordingly, the Court **GRANTS** YouTube's motion to dismiss on both counts.  For the reasons stated above, leave to amend is granted as to the first claim, but not as to the second.

**VI.   ALPHABET'S MOTION TO DISMISS**

Alphabet moves to dismiss on the same grounds as YouTube, namely, lack of factual allegations against Alphabet and no legal claim based on the right of the author.  Mahon's sole timely allegation of infringement against Alphabet is that the Film was available for purchase on Google Play in December 2019.  (Alph. Compl. ¶ 35; Exs. 31-33.)  As with YouTube, Mahon's letter to Google expressly states that the Film was available "on your platform in Ireland, the United Kingdom, and Europe" only.  (*Id.* Ex. 37.)  And as with YouTube, Mahon purchased the Film in euros and makes no allegations that the Film was available in the United States or that Alphabet participated in, or contributed to, Visual Data's copying of the Film.  Accordingly, Mahon fails to state a claim for copyright infringement because the alleged act of infringement took place abroad.  *See supra* Section IV.B.  Moreover, Mahon fails to state a claim for right of the author because federal law does not recognize such rights.  *See supra* Section III.B.

United States District Court
Northern District of California

1    Accordingly, the Court **GRANTS** Alphabet's motion to dismiss on both counts.  For the

2  reasons stated above, leave to amend is granted as to the first claim, but not as to the second.

3  **VII.    APPLE'S MOTION TO DISMISS**

4    Apple moves to dismiss Mahon's claims on the grounds that (1) federal law does not

5  recognize right of the author claims, and (2) the Court lacks personal jurisdiction over Apple

6  Distribution International Ltd ("ADI").  Apple does not move to dismiss the copyright claims

7  against Apple Inc., iTunes Store, or Does 1-13.

8    Beginning with the first issue, the Court finds that federal law does not recognize the law

9  of the author.  *See supra* Section III.B.  That part of Apple's motion is granted.

10    As the second issue, Mahon makes the following jurisdictional allegations against ADI:

11  (1) ADI is "headquartered in Cork, Ireland," (2) ADI is "Apple Inc.'s international iTunes

12  business operated by Apple Inc.," and (3) the receipts of Mahon's purchases of the Film from

13  iTunes identify ADI as the source.  (Apple Compl. ¶ 9, Exs. 32, 36; Dkt. No. 1 ¶ 9.)  Mahon

14  makes no other allegations to suggest that ADI has any minimum contacts with this District.

15  Instead, Mahon argues that ADI is an alter ego for Apple Inc. and that Apple generally possessed

16  unauthorized copies of the Film from Entertainment One LP.

17    For the reasons similar to those stated in Section IV.A(1)-(2), *supra*, Mahon's allegations

18  fail.  First, Mahon fails to allege facts to show that ADI is an alter ego of Apple Inc.  Specifically,

19  Mahon does not analyze undercapitalization, observation of corporate formalities, or any other

20  factor that the Ninth Circuit considers under the alter ego test to establish general jurisdiction.  *See*

21  *In re Boon Global Ltd.*, 923 F.3d at 653-54.  Second, Mahon fails to allege *any* minimum contacts

22  between ADI and the United States, much less this District.  Personal jurisdiction must be

23  established for each defendant.  *See Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 848 (N.D. Cal.

24  2018).  Mahon's jurisdictional allegations against Apple Inc. fail to demonstrate personal

25  jurisdiction over ADI, nor does Mahon make a colorable showing that jurisdictional discovery

26  would change the result.

27    Accordingly, the Court **GRANTS** Apple's motion to dismiss the right of author claim and

28  all claims against ADI, with leave to amend.

**VIII.   CONCLUSION**

For the foregoing reasons, the Court **ORDERS AS FOLLOWS:**

1. Mainsail's motion is **GRANTED IN PART** and **DENIED IN PART.**  Leave to amend is denied as to right of author claims, as any such amendment would be futile.

2. Entertainment One's motion is **GRANTED IN PART** and **DENIED IN PART.**  Leave to amend is denied as to right of author claims, as any such amendment would be futile.

3. YouTube's motion is **GRANTED.**  Leave to amend is denied as to right of author claims, as any such amendment would be futile.

4. Alphabet's motion is **GRANTED.**  Leave to amend is denied as to right of author claims, as any such amendment would be futile.

5. Apple's motion is **GRANTED.**  Leave to amend is denied as to right of author claims, as any such amendment would be futile.

Mahon may file an amended complaint in each action other than 20-cv-01527 no later than September 4, 2020.  Defendants shall file a response within twenty-one days of the filing of an amended complaint in their action.

With regards to case number 20-cv-01527, Mahon may conduct jurisdictional discovery as outlined in this Order.  Mahon may file an amended complaint in this case no later than ninety (90) days of this Order.  Entertainment One shall file a response within twenty-one (21) days of such filing.

To the extent that a defendant files another motion to dismiss, none shall raise any new ground which could have been raised in each's initial motion to dismiss.

**IT IS SO ORDERED.**

Dated: August 7, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California